Denise B. NEIS, Plaintiff,

v.

FRESENIUS USA, INC., Defendant.

No. 01–70503.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 28, 2002.

Raymond J. Sterling, Driggers, Schultz, Troy, MI, for plaintiff.

Donna R. Sudnick, Nancy H. Pearce, Finkel, Whitefield, Farmington Hills, MI, for defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STRIKE DECLARATION

EDMUNDS, District Judge.

This matter came before the Court on Defendant's motion for summary judgment and Defendant's motion to strike declaration. For the reasons set forth below, Defendant's motion for summary judgment is DENIED and Defendant's motion to strike declaration is DENIED.

### I. Facts

The present case involves allegations of sex discrimination. Defendant Fresenius USA, Inc. ("Defendant") is a national provider of products and services to individuals with chronic kidney failure. Defendant has a network of dialysis clinics and it supplies dialysis machines and related disposable products required for the operation of those machines; it provides these products to dialysis clinics it owns as well as clinics owned by other entities.

Plaintiff Denise Neis ("Plaintiff") was hired to the position of Regional Sales Manager ("RSM") in 1993 when Defendant purchased Abbott Industries Laboratories' dialysis division "Abbott Renal Care." Plaintiff was hired by Abbott in approximately November of 1990. *See* Plaintiff's Deposition at 93–96. Prior to Defendant's purchase of Abbott Renal Care, Plaintiff had responsibility for Abbott's Michigan territory. *See id.*[1]

As an RSM, Plaintiff was responsible for increasing and procuring sales of Defen-

---

1. At or about the time Defendant purchased Abbott Renal Care, Marlon Mangus ("Mangus") was responsible for the Michigan sales territory. *See* Plaintiff's Deposition at 96. At the time of the purchase, Plaintiff, along with five to seven other Abbott employees were retained by Defendant; Plaintiff continued to be responsible for the Michigan sales territory. *See id.* Mangus was promoted to the supervisory position of Director of Sales ("DOS") for the Michigan territory and elsewhere. *See id.*

dant's products within her territory. To accomplish this, Plaintiff was required to visit various dialysis and renal care facilities, help to arrange nurse visits to the facilities, field questions from her customers and ensure smooth delivery of products ordered by her customers. *See* Plaintiff's Deposition at 106.

During the period of mid-July of 1996 through the end of September of 1996, Plaintiff took a ten-week disability/maternity leave related to the birth of her child. During her leave, Plaintiff's accounts were covered for her by other Fresenius employees. *See id.* at 131. Plaintiff received the commissions for sales made by those covering her territory during her leave.

In approximately September of 1996, shortly after Plaintiff's return from maternity leave, Defendant acquired another provider of dialysis products and services, National Medical Care ("NMC"). As with Defendant's 1993 acquisition of Abbott, Defendant's acquisition of NMC entailed the merger of what had previously been two independent sales workforces. *See* Kanski Affidavit ¶ 3. Defendant attempted to mesh its sales force with NMC's by assigning certain of the NMC sales representatives to the "laboratory" business and realigning the "product" sales territory for the remaining NMC and Fresenius sales representatives. *See* Kanski Affidavit ¶ 6–8.

Just as Plaintiff was retained in the Michigan territory when Defendant purchased Abbott, NMC sales representative David Howes ("Howes") was retained in the Michigan territory (his territory with NMC) when Fresenius acquired NMC. The retention of both Howes and Plaintiff in the Michigan territory necessitated a realignment of the customers and accounts within the Michigan territory between them, and in approximately December of 1996, Plaintiff and Howes began the process of dividing the Michigan territory between them. *See* Plaintiff's Deposition at 128.

Plaintiff was directed by Robert Kanski ("Kanski"), Defendant's Executive Director of Sales, to prepare a written proposal for dividing the Michigan territory between Howes and herself. *See* Plaintiff's Deposition at 135–136. Plaintiff's first written proposal included a north/south geographic split with Plaintiff taking the southern portion of the territory. *See* Plaintiff's Deposition at 146. Howes' responding proposal also included a north/south geographic split with Howes taking the northern portion of the territory. *See* Plaintiff's Deposition at 329.

Although Plaintiff and Howes exchanged proposals regarding division of the Michigan territory and the customers therein, in January or February of 1997, Plaintiff, Howes and Kanski met to attempt to finalize the territory reconfiguration. *See* Plaintiff's Deposition 160. Kanski directed Plaintiff and Howes to divide the territory's biggest customers—Greenfield and the "FMC" facilities. *See id.* at 181. Ultimately, at the conclusion of the meeting, an agreement was reached between Plaintiff and Howes. *See id.* at 185–186. Plaintiff testified that she was not "happy" with the division since she was not in favor of any territory division nor in favor of retaining Howes as an RSM in the Michigan territory. Plaintiff indicated that she did not believe that coverage of the territory required two sales representatives and she would have preferred to retain all of the Michigan territory. *See id.* at 98–99, 264. Plaintiff and Howes nonetheless divided the territory and its biggest customers, including the Greenfield, FMC and Total Renal Care facilities.

A few months later, around April of 1997, Plaintiff's and Howes' territories were adjusted following a demand from St. John Dialysis Network ("SJDN") that

Plaintiff be removed from the account. *See* Plaintiff's Deposition at 194–195; N. Johnson Affidavit. According to Defendant, just prior to entering into a large sales contract with SJDN, Nancy Johnson ("Johnson"), SJDN's Director of Nursing, contacted Defendant regarding her dissatisfaction with Plaintiff as a sales representative. Johnson requested that Plaintiff be removed from SJDN's sales account. *See* Johnson Affidavit. In response to this customer demand, Defendant removed Plaintiff from this account. Howes was assigned the SJDN account and Plaintiff received various other accounts in exchange for the ones removed from her territory as a result of the customer complaints. *See* Plaintiff's Deposition at 199–200.

During the period of approximately April of 1997 through July of 1998, Plaintiff's and Howes' territories remained relatively static although both sales representatives received additional accounts as a result of further territorial realignments outside the Michigan territory.[2] In addition, the process of merging Defendant's and NMC's sales staff begun in late 1996 continued throughout 1997 and into 1998. At the beginning of 1997 there were 39 sales representatives; by the end of 1998, there were only 32 sales representatives. Seven territories were split and/or assigned to existing RSM's thereby effectively reducing the size of the RSM staff. *See* Kanski Affidavit ¶ 18–19.

Defendant claims that a review of the Michigan territory size, patient count, commission rates and in view of the overall consolidation of business within the industry led it to conclude that the Michigan territory should be consolidated; one of the Michigan sales positions would have to be eliminated. *See* Kanski Affidavit ¶ 17–18. The territory consolidation decision was effectuated on August 12, 1998 when Plaintiff was laid off; David Howes was assigned to cover all of Michigan.[3] Defendant claims that Plaintiff was selected for layoff following its receipt of customer complaints regarding her job performance coupled with demands from certain customers that Plaintiff be removed from their accounts. Plaintiff claims that her termination was premised based on sex discrimination.

In support of its case, Defendant points to several affidavits of customers served by Plaintiff who were dissatisfied with her performance. The list of complaints are as follows: *Total Renal Care* ("TRC"); Dianne French ("French"), Director of approximately 20 TRC Facilities, complained to Plaintiff's immediate supervisor, Mike McCarthy, in March of 1998. Ms. French requested that Plaintiff be removed from the TRC accounts. *See* French Affidavit. Ms. French's request was not granted; McCarthy explained to French that Defendant attempted to keep territories equitable by maintaining similar patient numbers between sales representatives, e.g. Howes and Plaintiff. *See* McCarthy Affidavit ¶ 4–7; French Affidavit ¶ 5.

*Fresenius Medical Care* ("FMC"); in approximately June of 1998, Carol Bielecki ("Bielecki"), Regional Manager North Central Area FMC, also contacted Defendant and requested that Plaintiff be removed as FMC's sales representative. *See* Bielecki Affidavit. After speaking with Bielecki regarding her complaints about Plaintiff, McCarthy advised Plaintiff that it

---

**2.** In approximately August of 1997, RSM David Meistrich left the company. Certain of his accounts were distributed to Plaintiff and Pam Brown. As a result, other Michigan accounts were redistributed to Howes.

**3.** Plaintiff was the only individual laid off because, Defendant claims, natural attrition otherwise effectively reduced the RSM staff.

would not be acceptable for Defendant to receive another incident regarding a customer complaint. *See* McCarthy Affidavit ¶ 9. On or about June 11, 1998, McCarthy met with Bielecki, Plaintiff and Sheryl Amitucci, FMC's Area Administrator, West Michigan Area, in an attempt to address the situation. During the course of the meeting, Bielecki voiced concerns regarding "product problems, customer service issues, poor delivery, running of product" and "staff's perception of poor visibility after conversion." Plaintiff's Deposition at 231–237. Despite all the foregoing, Plaintiff's accounts were not removed from Plaintiff's territory in June of 1998.

In July of 1998, Diane French again complained of the sales service provided by Plaintiff and notified Defendant that Plaintiff would not be allowed back into the Toledo TRC unit and that "we no longer want her as our sales rep." French Affidavit ¶ 6; Plaintiff's Deposition at 208–215. The final incident giving rise to French's demand that Plaintiff be removed and replaced as TRC's sales representative stemmed from an improper order and shipment of dialysis machines to one of TRC's units in Ohio. French Affidavit ¶ 6; Plaintiff's Deposition 215–220.

On August 11, 1998, Dr. Lipshitz, Medical Director of the Ann Arbor FMC facilities also notified McCarthy that he did not want Plaintiff "in any of his units." *See* McCarthy Affidavit ¶ 11, Exhibits C1–C3. *Greenfield Health Systems* ("Greenfield"); David Shepard ("Shepard"), Vice President of Greenfield, complained to Kanski regarding the manner in which Plaintiff serviced Greenfield's facilities and requested that Plaintiff be removed as a sales representative from the account. *See* Shepard Affidavit.

On August 12, 1998, Jack Johnson and Kanski met with Plaintiff notifying her of the territory consolidation and that she had been selected for layoff. Although clearly upset with the news of her layoff, Plaintiff informed Johnson and Kanski that if the decision "had gone the other way (Howe's territory eliminated) she would not be able to do the travel because of her daughter." *See* J. Johnson Affidavit, Exhibit A. Plaintiff indicated to her supervisors that "she would have [had] to resign anyway." *See id.* ¶ 7–9. Plaintiff denies that she made these statements. *See* Plaintiff's Deposition at 264–265. Furthermore, Plaintiff has brought forward evidence that she claims is indicative of discrimination.

■ First, Plaintiff directs the Court to a declaration filed by Ardys Vegas ("Vegas"), a salesperson who worked for Defendant for approximately 8 years. *See* Vegas Declaration attached as Plaintiff's Exhibit A. This declaration is the subject of Defendant's motion to strike. Defendant claims that this declaration does not meet the requirements of FED. R. CIV. P. 56. Specifically, Defendant argues that this declaration is not based on personal knowledge as the declaration provides "I declare under the penalty of perjury, that the foregoing is true and correct to the *best* of my knowledge, information and belief." See Vegas Declaration attached as Plaintiff's Exhibit A, (emphasis added). The Sixth Circuit rejected this argument in *Williams v. Browman,* 981 F.2d 901, 905 (6th Cir.1992)(declaration "under penalty of perjury" that "foregoing is true and correct to the *best* of my knowledge, information and belief" complies with statutory requirements)(emphasis added). Defendant also claims that this declaration does not contain any admissible facts since it largely contains inadmissible hearsay. While portions of the declaration may be inadmissible, the majority of the declaration's contents is admissible. The Court will disregard the inadmissible portions of the declaration, however, Defendant's mo-

tion to strike the entire declaration is DE-NIED.

In the declaration, Ms. Vegas states that in February 1998, just six months before Plaintiff's termination, that Kanski stated to her that "he did not think that women should be in sales positions, especially nurses" *See id.* ¶ 3. This comment directly pertained to Plaintiff, a sales representative with a nursing background. Plaintiff also claims that shortly after she returned from maternity leave in 1996, which was also the first time Plaintiff met Kanski, Kanski told her "you don't want to travel, you have a new baby at home." *See* Plaintiff's Deposition at 159–160. Kanski denies making these statements. *See* Kanski Deposition at 182–183.

During that same discussion, Plaintiff claims that Kanski also asked her if she was going to have any more children. *See* Plaintiff's Deposition at 160–161. Plaintiff reported this improper questioning to her supervisor Claudia Jaffa ("Jaffa"); Jaffa told Plaintiff that Kanski was concerned that she was a new mother and that Kanski doubted a new mother could cover her territory. *See* Plaintiff's Deposition at 162, 166, 211. Furthermore, Plaintiff's primary supervisor, Marlon Mangus ("Mangus"), advised Plaintiff that Kanski had "concerns about [Plaintiff's] being a new mother" and that "Kanski had made a comment to him that he had never seen a mother choose business over her children and he had been burned before." *See* Plaintiff's Deposition at 213.

Plaintiff also claims that Kanski said "look at this as your opportunity to stay at home with your new baby" during the meeting at which Plaintiff was terminated. *See id.* at 269, 342. Jaffa testified that Kanski was condescending to her as a female and treated her differently than the other three directors of sales, all of whom were male. *See* Jaffa Deposition at 75. Jaffa also testified that several female em-

ployees of Defendant came to her to complain about Kanski's discriminatory treatment of women. *See id.* at 79. Jaffa observed that Kanski was "very condescending" in the way he treated female employees. *See id.* at 71–72, 75.

Mangus admitted that Kanski made numerous statements indicative of his bias against females; this problem became so severe that Mangus even warned Kanski that his anti-female sentiment was creating problems within the workforce. *See* Mangus Deposition at 173–174, 181–182.

Regarding her performance, Plaintiff provides evidence that she was consistently one of the top performing salespersons in the company. Plaintiff had three direct supervisors while employed by Defendant. The first, Mangus, admitted that Plaintiff was consistently a top performer, was a profit center for Defendant, was well qualified to progress up to Kanski's vice president position, and was truthful, loyal, hardworking, and energetic. *See* Mangus Deposition at 13–14, 19, 23, 41, 44. Mangus testified that Plaintiff represented herself and the company well and always had good customer relations during his supervision of her. *See* Mangus Deposition at 57–58. Mangus further testified that Plaintiff won more sales awards than any other employee while she worked at the company. *See* Mangus Deposition at 115–116. He testified that Plaintiff more than quadrupled Defendant's market share (20% to 88%) while she was the Michigan sales representative, which he characterized as an "outstanding" result. *See id.* at 145. He further testified that Plaintiff was always over quota, even as of the date of her firing. *See id.* at 25, 165, 168–170.

The year prior to Plaintiff's termination, Claudia Jaffa became Plaintiff's supervisor when Mangus was promoted. Jaffa was equally enthusiastic about Plaintiff, both personally and professionally. Jaffa testi-

fied that she had a good rapport and a high degree of respect for Plaintiff. *See* Jaffa Deposition at 46–47. Jaffa described Plaintiff as loyal, hardworking, ambitious, and having a high level of integrity. *See id.* at 46–47. Plaintiff's third supervisor, Mike McCarthy also "had top level things to say about [Plaintiff]." *See* McCarthy Deposition at 86–87. Plaintiff has attached several documents that support her contention that she was one of the top performing salespersons for Defendant. *See* Plaintiff's Performance Evaluations attached as Plaintiff's Exhibit B (stating that Plaintiff was Defendant's "Salesperson of the year for 1995 & 1996").

## II. Analysis

■ Plaintiff filed a single court complaint alleging that Defendant violated Michigan's Elliott Larsen Civil Rights Act ("ELCRA"), MCLA 37.2101 *et seq.* on the basis of Plaintiff's gender with respect to her "terms, conditions, and privileges of employment due to its predisposition or intent to discriminate based on Plaintiff's pregnancy and/or concern regarding pregnancy." Complaint at ¶ 14, 15. In evaluating discrimination claims under ELCRA, Michigan Courts generally follow federal law, including the burden shifting approach outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See Lytle v. Malady (on rehearing),* 458 Mich. 153, 579 N.W.2d 906 (1998).

### A. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### B. Sex–Discrimination

#### 1. Prima Facie Case

■ The *McDonnell Douglas* test requires Plaintiff to show: (1) she was a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position she lost, and (4) she was replaced by someone outside the protected class ... [or] a comparable non-protected person was treated better. *Ensley–Gaines v. Runyon,* 100

F.3d 1220, 1224 (6th Cir.1996). In a termination case such as this one, Plaintiff meets the second prong by showing that she was performing "at a level which met [her] employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990).

 If Plaintiff successfully establishes a prima facie case, the burden of production shifts to Defendant to articulate a "legitimate, nondiscriminatory reason" for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Defendant fails to satisfy this burden, Plaintiff prevails. If Defendant satisfies this burden, then the presumption of intentional discrimination is negated; Plaintiff must then prove by a preponderance of the evidence that Defendant intentionally discriminated against her. She may do this by showing that the "nondiscriminatory" reasons the employer offered were not credible, but were merely a pretext for intentional discrimination. *See id.; see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (stating that the factfinder's "disbelief of the reasons put forward by the defendant" may, "together with the elements of the prima facie case, suffice to show intentional discrimination").

 The prima facie requirement for making a Title VII claim "is not onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, and poses "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987). The prima facie phase "merely serves to raise a raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'"

*Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir.1999)(*quoting Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089). It is "only the first stage of proof in a Title VII case," and its purpose is simply to "force [a] defendant to proceed with its case." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861–62 (6th Cir.1997). This division of intermediate evidentiary burdens is not meant to stymie plaintiffs, but simply serves to "bring the litigants and the court expeditiously and fairly to the ultimate question." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

 This Court finds that Plaintiff has established a prima facie case of discrimination. Kanski's statements alone provide direct evidence of discrimination.[4] *See, e.g., DeBrow v. Century 21 Great Lakes Inc.*, 463 Mich. 534, 620 N.W.2d 836 (2001)(plaintiff's supervisor's comment that plaintiff was "getting too old for this shit" constituted direct evidence of age discrimination); *see, contra Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir.1996)(supervisors inquiry whether female employee planned to have family and comment "have all the kids you would like—between spring, summer and fail. I will not work your territory during the winter months" was not direct evidence of discrimination; such comment was neither timely nor causally related to discharge decision); *Preston v. Berendsen Fluid Power*, 125 F.Supp.2d 245 (W.D.Mich.2000)(male supervisor's comments to subordinates to effect that women did not belong in industrial sales was not "direct evidence" of discrimination; summary judgment, however, was not ultimately granted for Defendant in

---

4. Under this direct evidence approach, Plaintiff is not required to show pretext. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that the adverse employment action would have occurred even in the absence of the illegal motivation. *Harrison v. Olde Financial Corp.*, 225 Mich.App. 601, 609, 572 N.W.2d 679 (1997); *EEOC v. Freedom Adult Foster Care Corp.*, 929 F.Supp. 256, 260 (E.D.Mich.1996).

this case and the case was allowed to proceed through circumstantial evidence).

■ Defendant contends that Plaintiff has not established a prima facie case since Plaintiff cannot meet the "qualification" and "different treatment of similarly situated employees'" prongs of the test. Plaintiff's performance evaluations and numerous sales awards, coupled with the testimony of her supervisors show that Plaintiff was not only qualified, but indeed was an outstanding salesperson. Defendant contends that numerous customer complaints necessitated Plaintiff's termination. Plaintiff points to her outstanding employment record. Whose version of the facts to believe is not for this Court to decide, but rather for the trier of fact.

The Sixth Circuit has explained in *Cline, supra,* that on a motion for summary judgment, this Court should consider whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. The court first determines if Plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements, including whether she has met the legitimate expectations of her employer. It performs the same function with respect to Defendant's production of evidence, and again for Plaintiff's response to that production. This is true even if that "production" evidence happens to show that, in the employer's view, Plaintiff was not meeting its legitimate expectations for the position at issue.

*Cline* explained that *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) instead mandates that at least with respect to the employer's proffered nondiscriminatory reason, the prima facie case is no longer relevant—it has "dropped out" of the inquiry. Plaintiff thus enjoys the full opportunity to show that reason to be pretextual as part of the third stage of *McDonnell Douglas.* While a plaintiff may very well lose on summary judgment because she fails to proffer evidence on that "ultimate issue," "a court misapplies the structure of *McDonnell Douglas* by holding that she fails at the prima facie stage due to defendant's nondiscriminatory reason." *Cline, supra,* at 663.

As in *Cline,* Defendant may have sharp retorts to many of Plaintiff's factual claims. Indeed, many of its responses could well convince a trier of fact of its case. But at this stage in the trial, this Court's role is not "to weigh the evidence and determine the truth of the matter," *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505, but "to determine whether there is a genuine issue for trial." *Id.* To do so, the court must look at the evidence and make all reasonable inferences in the light most favorable to Plaintiff. *See National Enterprises, Inc.,* 114 F.3d at 563. If, in that light, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a trial—and not summary judgment—is warranted. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Observed in a light most favorable to her, Plaintiff has offered evidence sufficient to clear this hurdle.

**2. Legitimate Nondiscriminatory Reason for Termination**

■ As stated earlier, if Plaintiff establishes a prima facie case, then Defendant must come forward with a "legitimate, nondiscriminatory reason" reason for its actions. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Defendant fails to satisfy this burden, Plaintiff prevails. Defendant's has sufficient evidence to meet this burden. The numerous affidavits filed in this case reveal that several of Defendant's biggest customers were dissatisfied with Plaintiff's

performance. Some customers even requested that Plaintiff be removed from their accounts. This evidence creates a legitimate, nondiscriminatory reason for Defendant's termination of Plaintiff, and Defendant satisfies its burden on this point.

### 3. Pretext

■ Since Defendant has satisfied the burden that it show a legitimate, nondiscriminatory reason for its termination of Plaintiff, Plaintiff must now prove by a preponderance of the evidence that Defendant intentionally discriminated against her. She may do this by showing that the "nondiscriminatory" reasons offered by Defendant were not credible, but were merely pretext for intentional discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Plaintiff may show pretext by any of three means: (1) by showing the reasons had no basis in fact; (2) by showing the reasons were not the actual factors motivating the decision; (3) by showing the alleged reasons were jointly insufficient to justify the decision. *See Dubey v. Stroh Brewery Co.,* 185 Mich. App. 561, 565–566, 462 N.W.2d 758 (1990); *Dixon v. WW Grainger, Inc.* 168 Mich.App. 107, 116, 423 N.W.2d 580 (1987). At this stage, Plaintiff's prima facie case becomes relevant again as "the evidence and inferences that properly can be drawn from the evidence presented during the plaintiff's prima facie case may be considered in determining whether the defendant's explanation is pretextual." *Town v. Michigan Bell Telephone, Co.,* 455 Mich. 688, 697–698, 568 N.W.2d 64 (1997).

■ Plaintiff correctly contends that Kanski's derogatory comments regarding women, Plaintiff's unblemished employment record before the sudden drop, De-

fendant's disparate treatment of Plaintiff and her male colleagues, and Defendant's departure from its usual personnel practices (Plaintiff was the only RSM laid off) are sufficient to establish pretext. These facts are sufficient to raise a genuine issue of material fact regarding discrimination; these facts allow Plaintiff to present her case to a jury. *See Ross v. Campbell Soup Co.,* 237 F.3d 701 (6th Cir.2001)(sudden negative employee evaluations after years of good performance often indicates discrimination); *Pennington v. Western Atlas Inc.,* 202 F.3d 902 (6th Cir.2000)(evidence of pretext where employees fired for performance but their appraisals indicated excellent work one year earlier).

■ Plaintiff also effectively argues in her brief that Defendant's stated need to consolidate the Michigan sales territory due to "changing market conditions" is pretextual. *See* Plaintiff's Response Brief at 17–20. Although there may be justification for economic layoffs, employer may not decide which employees to lay off on basis of considerations that are prohibited by law, such as race, gender, or age. *See Featherly v. Teledyne Industries, Inc.,* 194 Mich.App. 352, 355, 486 N.W.2d 361 (1992). Various deposition testimony can lead to the conclusion that there was no need to consolidate the Michigan territory. *See* Howes Deposition at 130; Jaffa Deposition at 167–168; Kanski Deposition at 170–171. Therefore, Plaintiff raises a genuine issue of material fact on this issue as well.

### III. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is DENIED and Defendant's motion to strike declaration is DENIED.