disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. Whether Ross is such a plaintiff lies in the question of whether Campbell Soup Co. regarded him as substantially limited from performing a broad class of jobs. In cases such as this one, where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute. We therefore conclude that Ross has presented sufficient evidence to create a genuine issue of material fact as to the company's state of mind during the events that led to his firing. The resolution of that issue is properly left to the jury.

### CONCLUSION

For the reasons set out above, we conclude that the district court erred in granting summary judgment to the defendant on the question of whether the plaintiff was "regarded as" disabled under the ADA, and we therefore REVERSE the judgment entered below and REMAND the case to the district court for further proceedings consistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0009P (6th Cir.)
File Name: 01a0009p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

DALE ROSS,
         *Plaintiff-Appellant,*

         *v.*                          No. 99-4203

CAMPBELL SOUP COMPANY,
         *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00196—Kathleen McDonald O'Malley,
District Judge.

Argued: October 26, 2000

Decided and Filed: January 10, 2001

Before: DAUGHTREY and CLAY, Circuit Judges;
COHN, District Judge.*

———————————

#### COUNSEL

**ARGUED:** Andrew L. Margolius, Cleveland, Ohio, for Appellant. Susan M. DiMickele, SQUIRE, SANDERS &

---

*The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

DEMPSEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Andrew L. Margolius, Cleveland, Ohio, for Appellant. Susan M. DiMickele, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, Ronald J. James, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

———————

## OPINION

———————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  In this Americans with Disabilities Act (ADA) case, the plaintiff, Dale Ross, appeals the district court's order granting summary judgment to the defendant, Campbell Soup Company, based on the court's determination that Ross had failed to present evidence of discrimination on the basis of disability under the ADA, 42 U.S.C. §§ 12101-12213 (2000). On appeal, Ross claims that the district court erred in finding no issue of material fact on three points:  (1) that Ross was not disabled within the meaning of the Act; (2) that Campbell Soup did not regard Ross as disabled within the meaning of the Act; and (3) that Ross did not present direct evidence of discrimination on the basis of disability.  Although we conclude that the district court was correct in its ruling with regard to the question of Ross's actual disability, we further conclude that there exists a genuine issue of material fact concerning the company's alleged perception that Ross was disabled within the meaning of the ADA.

## FACTUAL AND PROCEDURAL BACKGROUND

Ross's position at the company was that of sales merchandiser working exclusively in Campbell's frozen foods division.  His primary responsibility was traveling between corporate customers in his sales area and presenting proposals for the sale and display of Campbell's product. As part of his job, Ross was required to lift cases of Campbell's frozen foods, which generally weigh around ten pounds. According to Ross's deposition testimony, he was never required to lift more than one case of frozen food at a time.

*Id.* at 2108-09.  In this case, the implications of Campbell's pretext are twofold: first, it provides evidence as to the company's discriminatory intent in firing Ross, and second, because it tends to prove discriminatory intent, the evidence of pretext may also tend to show that Campbell Soup Co. regarded Ross as disabled.

However, as the company correctly notes, "It is not enough . . . that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2nd Cir. 1998).  In this case, the standard mandates that Campbell Soup Co. must have regarded Ross as significantly limited in his ability to lift or in his ability to work in a broad class of jobs, not simply his job at Campbell Soup.  Again, this is a question of Campbell's state of mind that is more appropriate for the jury than for the judge.  The district court found that "[t]he absence of a physician's statement of disability, along with the frequency, and, more importantly, duration of Ross's absences, particularly the final absence, caused Campbell Soup to become suspicious of Ross's claims of continued injury and pain."  In other words, the district court concluded that the company did not regard Ross as disabled, but rather as a malingerer.  We believe that in doing so, however, the district court drew a conclusion from the evidence regarding the defendant's state of mind that should be left to the jury.  Moreover, in a motion for summary judgment, all inferences must be made in favor of the non-moving party.  *See National Enterprises v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  Here, to the contrary, the district court drew evidentiary conclusions in favor of Campbell Soup Co.

Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA.  It is a question embedded almost entirely in the employer's subjective state of mind.  Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was

The record provides sufficient evidence to create a factual dispute concerning that Campbell officials' proffered reasons for firing Ross and whether they were, in fact, pretextual. As the district court correctly noted in dicta, based on the favorable performance reports submitted by Ross, the company's assertions that Ross was not qualified for his job "simply are not persuasive." Moreover, the chain of events leading to Ross's termination – including the sudden drop in his performance evaluation, the dramatic increase in his sales quotas, the invitation to retire, the COBRA letter, and the back case memorandum – creates a reasonable inference that Campbell's assertion that Ross was fired for failure to meet performance goals is false.

The district court stated that "on the record presented, it appears unlikely, if not impossible, that Ross would also be able to show that his performance failures were a pretext *for discrimination*." (Emphasis in original.) The district court appears to have been operating under the assumption that Ross must prove not only that Campbell's decision to fire him was pretextual, but also that discrimination on the basis of disability was its true motive. However, under the Supreme Court's recent decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097 (2000), the probative value of pretext in a discrimination case has been reaffirmed, and we are reminded that when the elements of a prima facie case have been met, a plaintiff need not show both pretext and discriminatory intent ("pretext plus"). *Id.* at 2108. In *Reeves*, the Court held that

> once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

During his employment at Campbell, Ross suffered a series of five back injuries. The first, a lumbar strain, occurred in 1987, causing Ross to miss three weeks of work. He next suffered a back spasm in 1989 while lifting, but the record does not indicate how long Ross was absent from work as the result of this injury. Ross then suffered a lumbar strain in 1991, which caused him to be out of work for three more months, and a lumbar tightening in May 1993, which led to a two-month absence. Ross did not request accommodation from Campbell after any of these injuries, nor did he ever specifically state to Campbell that he suffered from a disability. Indeed, Ross testified that it was his understanding each time he returned to work that he was not under any restrictions, "because [he] was not allowed to return to work until [he] was, in Campbell's eyes, a hundred percent."

Finally, Ross injured his back a fifth time on December 3, 1993, while reaching into a company car. The injury was diagnosed as lumbar-sacral strain. On December 20, Ross obtained a disability certificate form from his physician, Dr. George Randt. The form indicated that Ross could return to work on "approximately" January 2, 1994, and, as between options to indicate that the patient could return to either "light" or "regular" work, Dr. Randt selected "regular" work. Ross provided this form to Campbell but told his supervisors that he was still in pain, was seeking a second medical opinion, and would not return to work on January 2 as planned. Ross then saw a second physician, Dr. Jeffrey Wilber, who recommended Ross have a magnetic resonance imaging test performed to assess the condition of his spine. According to Ross, the MRI indicated a protruding disc and two degenerative discs in his lower back and, as a result, Dr. Wilber suggested that he avoid heavier lifting and bending at work. Ross also testified that in December 1994 -- after he had been fired from Campbell Soup -- Dr. Wilber specifically instructed him not to lift more than 25 pounds. There is in the record a report from a physical therapy clinic indicating that Ross received treatment for the December 1993 injury, that he was considered at that time to be unable to "resume normal work activities such as lifting, reaching, stooping and twisting

due to increased low back pain, decreased flexibility and strength," and that he had "[m]oderate limitation in forward bending, backward bending, and rotation with increased pain."

However, Ross did not communicate these diagnoses to his supervisors at Campbell Soup Co., fearing, he later testified, that he would lose his job. He admitted that he had not suffered adverse job consequences after any of his prior back injuries, but pointed to a comment made by a supervisor, Bill Holder, during his 1993 performance evaluation, that "[w]e can't have any more of this back thing." Ross also testified that during the time he was off work for his last injury, Campbell employees followed him to medical appointments, obtained medical records from his doctors, and spied on him at his home. In fact, Charles Carter, a Campbell supervisor, testified that he "checked up" on Ross while Ross was away from work because of his back problems, and another Campbell employee testified that a supervisor had commented that he was sorry Ross had put up a fence around his home which kept the supervisor from being able to see what Ross was doing while out on disability leave.

On February 17, 1994, Joe Patin, director of frozen food at Campbell Soup Co., sent a memo titled "Dale Ross Back Injury History" to Bill Holder, another of Ross's supervisors. The memo indicated the date of each of Ross's injuries, the injury's cause (all bending or lifting while performing the duties of his job), the medical diagnosis, and the date Ross returned to work after the injury. The memo also noted, "The above injuries all occurred while performing normal job duties for Dale's position."

Soon after the circulation of this memo, Ross was called in to a meeting with Patin and Holder. According to Ross, the conversation at this meeting started with Holder saying that the company had experts who could assist Ross in creating a résumé to help him find a new job. Ross said that he asked if he was being terminated and was told he was not, but that if he did not return to work, it would be considered job

by the ADA, that evidence must be weighed in consideration with the direct evidence of discrimination and, in a motion for summary judgment, must be considered in the light most favorable to Ross.

Finally, the likelihood that the company regarded Ross as disabled and acted with discriminatory intent in firing Ross is heightened by the evidence presented that Ross was otherwise qualified to perform his job at Campbell Soup Co. and that the justifications presented for firing Ross were pretextual. That this evidence is material to this point is a peculiar function of the "regarded as" prong of the ADA. As the regulations interpreting the ADA explain, [t]he purpose of the "regarded as" prong is to provide a cause of action to individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities." *See Sutton*, 527 U.S. at 489 (quoting 29 CFR pt. 1630, App. § 1630.2(l)). The regulations continue,

> Therefore, if an individual can show that an employer . . . made an employment decision because of a perception of disability based on "myth, fear, or stereotype," the individual will satisfy the "regarded as" part of the definition of disability. If the employer cannot articulate a nondiscriminatory reason for the employment action, an inference that the employer is acting on the basis of "myth, fear, or stereotype" can be drawn.

29 CFR pt. 1630, App. § 1630.2(l).

Because, under the "regarded as" prong, Ross's prima facie showing that he is disabled turns upon the employer's state of mind and how it thought Ross's back condition affected his performance as an employee, evidence of the employer's state of mind that would ordinarily be used to prove motive or discriminatory intent may also be probative of Ross's status as a person with a disability as defined by the ADA. Thus, evidence that the company created a pretextual reason for Ross's firing may tend to prove that it regarded Ross as a disabled employee.

sustained on this record.  As Ross argues on appeal, these comments came in the midst of a series of events that reflected upon Ross's back condition and upon the end of his employment with Campbell Soup Co., including the invitation for Ross to retire and the proffered résumé assistance, the creation of a memo tracking Ross's injury-related absences from work, Ross's receipt of a letter detailing his ability to COBRA his health benefits, and the comment made to Ross that "we can't have any more of this back thing."  When taken in the context of these other events, the back case comment hardly seems isolated.  In fact, it appears to be perhaps the most damning of a series of comments demonstrating the prominence of Ross's back condition in Campbell's decisions regarding his employment.

For, in addition to the "back case" memo, the record contains an undated "Job Accommodation Request Analysis" made out for Ross and signed by William Holder.  Though the form is apparently incomplete, it tends to demonstrate that Campbell officials did, at some point, regard Ross as disabled.    After noting that Ross had not requested accommodation and listing the essential functions of Ross's job, the form continues: "Have you reviewed these conditions with your medical department representatives to determine the condition(s) are disabilities rather than temporary impairments?"  To this question, Holder responded "Yes." Both Holder's unequivocal affirmative answer and its context – on a form one may reasonably assume is intended to assess what actions Campbell must take to avoid liability under the ADA – tend to show that the company thought it possible Ross was disabled within the meaning of the Act.

That likelihood is enhanced by other evidence Ross provided.  Holder's deposition testimony shows that he specifically considered whether Ross's back condition would be a disability under the ADA.  Holder stated, referring to Ross's back trouble, "There are certain things that will raise red flags to you that require that a person be given, maybe, a little extra benefit of the doubt."  Although Holder went on to state that he ultimately concluded Ross would not be covered

abandonment.  On February 25, 1994, Joe Patin sent Ross a memo that read:

> This will confirm my conversation with you in which I told you that we have reviewed our recent conversation and have determined, in light of Dr. Randt's full medical release, that you must return to full work activities immediately.  Your failure to do so could result in your termination.

Ross testified that he protested this order to return to work, but could not obtain authorization from his physician to remain on disability leave because his physician was recovering from surgery and was not in the office.  In any event, Ross did return to work shortly after his receipt of the February 25 memorandum.

On June 30, 1994, Ross was given his annual performance review, which was largely negative.  Up to this point, Ross had received marks of either "meets" or "exceeds expectations" in his performance reviews.  In the 1994 evaluation, Ross received for the first time a series of "needs improvement" and "unsatisfactory" marks.  Comments were made on the evaluation that Ross needed to increase communication with his supervisors, and also that he needed to improve his style of dress.  After this negative performance assessment, Ross was placed on a 90-day probationary period.

During the probationary period, Ross's performance goals were increased significantly.  For example, Ross's goal for sales of product was increased by 66 percent, and the number of displays Ross was to market was tripled.  Carter testified that Ross's goals were heightened for the probationary period as an incentive measure to get Ross to "go after his potential and be able to deliver what he was capable of doing."  Joe Patin said that he did not recall why Ross's objectives were raised.  Ross believed that the increase in his performance goals was a discriminatory attempt to cause him to fail.  He also testified that his sales territory was less productive than that of his co-workers, and that he therefore should not have been held to the same standards as workers with more densely

populated sales areas or headquarters in their territories. Indeed, Patin admitted in his deposition that Ross's territory had "less potential" and was "a lot less productive" than other employees' territories. But Ross also took a planned vacation during his probationary period, against the advice of his supervisors.

On July 11, 1994, Ross wrote a letter to Patin expressing his concern about the performance objectives for his probationary period. Ross noted in the letter that his goal for total cases sold had been raised to 416 cases per week, but that Bill Martin, another employee, had recently been honored in "In The Spotlight," a newsletter produced by the company, for selling 225 cases in one week. Ross disputed other comments that he had received in his evaluation, asked for specific examples and comments of skills he could improve, and ended the letter by writing, "I am sure that you also are aware of the serious back injury that I sustained and the effort that it has taken me to resume my former occupation. I am doing everything I can to meet your performance goals. Considering the impairment that I am currently rehabilitating, I look forward to hearing from you." Ross testified that he did not receive a response to this letter.

Near the beginning of the probationary period, another memo was circulated through company management, this one recommending that Ross not be given a bonus for the 1994 sales period. At the top of this memo, Richard Smith, another of Ross's supervisors, wrote, "Maureen – When can we bring this problem person to a termination status. P.S. – Back Case." At the bottom of the memo, another note, signed by "Kent" reads, "Richard -- I agree w/Joe Patin's assessment on a bonus for Dale Ross. Next steps?" Smith later testified that he was not in a position to fire Ross, but observed that, given the note, "obviously . . . the process was well along."

In the middle of the probationary period, Ross received a letter dated August 11, 1994, from his insurance company notifying him of his eligibility to COBRA his health benefits. The letter read, "We would like to remind you that even

noted that the comment was "ambiguous, and . . . not facially derogatory." Finally, the district court held that the memo could not be considered direct evidence of discrimination in Ross's termination because it was "made in connection with a determination of whether Ross should receive a bonus, not in connection with the termination decision," and was made after Campbell placed Ross on probation.

We also conclude that the district court too easily dismissed the "back case" memo as direct evidence of discrimination by the employer. Not only does the note identify Ross as a "problem person," a comment which cannot be taken in a positive light, but it also identifies him as a "back case." The ADA was enacted, in part, to eliminate the sort of stereotyping that allowed employers to see their employees primarily as their disabilities and not as persons differently-abled from themselves. That the note's author would think to identify Ross with the scrawled post-script "back case" demonstrates that there is at least a genuine issue of material fact that Campbell Soup Co. regarded Ross through the lens of his medical condition. It is precisely this sort of limited vision that the ADA seeks to eliminate.

Moreover, it would be less than reasonable to conclude that because these comments were written on a memo recommending Ross not receive a yearly bonus, they were not made in connection with the decision to end his employment with Campbell Soup Co. The comment reads: "Maureen – When can we bring this problem person to a termination status?" Clearly, the note refers not to the bonus that is the subject of the underlying memo, but rather to the company's imminent decision to end Ross's employment. The second comment, which ends "Next steps?", indicates that discussion of what action would follow denial of the bonus was occurring. The comments are related only tangentially to the piece of paper upon which they are written; their own meaning can be seen as foreshadowing Ross's termination.

Nor do we think the district court's characterization of the comments on the memo as an isolated remark can be

a claim. Under the "regarded as" prong of the ADA, membership in the protected class becomes a question of intent. And, as the district court correctly noted, "that question – *i.e.*, the employer's motive – is one rarely susceptible to resolution at the summary judgment stage."

In analyzing the "regarded as" prong of the ADA, the Supreme Court recently held:

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999). Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties.

We conclude that Ross has presented sufficient evidence to create a genuine issue of material fact concerning his claim that the company regarded him has a person with a disability within the meaning of the Act. Perhaps the piece of evidence most indicative of this fact is the "back case" memo, which the district court considered to be the only possible direct evidence of discriminatory conduct by the company. The district court ultimately held that the memo did not constitute direct evidence of discrimination, finding instead that it was an "isolated reference . . . insufficient to constituted direct evidence of discriminatory animus." The district court further

though you are no longer covered as an employee as of 08/01/94, you have the option to continue your benefits under the plan beyond this date." Patin later explained that the letter was generated by computer error and said that he corrected the situation with a phone call.

Ross failed to meet his probationary goal by a significant degree, selling only 1,355 cases of frozen food and thus falling far short of both his probationary goal of 5,000 cases and his previous year's objective of 3,000 cases. As a result, he ranked fifth out of five employees in most categories. The record also contains some evidence that Ross falsely inflated his actual performance totals, a fact that was learned by Campbell employees visiting stores in Ross's territory to verify his performance.

On October 21, 1994, Ross was officially terminated from employment at Campbell Soup Co. When asked if he considered himself disabled at that time, he responded "I considered myself having a problem." From the record, however, it appears that the only medical documentation made available to the company during Ross's employment was the disability form from Dr. Randt.

Ross filed suit in the district court claiming disability discrimination by Campbell Soup Co. under the Americans with Disabilities Act. The district court granted the defendant summary judgment, holding, first, that Ross had not proved that he "was disabled at the time of his discharge." The district court emphasized that Ross did not provide medical evidence of his condition until 1998, four years after his discharge. The district court also noted that even then, the diagnosing physician, Dr. Nash, did not state that Ross was "substantially limited" in major life activities, the legal standard articulated by the ADA. The court concluded that Ross was not substantially limited in either working or lifting, the two major life activities stated in Ross's claim, and emphasized the temporary nature of Ross's back pain, noting that numerous courts have found intermittent back pain not to be a disability.

The district court next found that Ross neither had a record of a disability nor was regarded as disabled by his employer. Rather, the court found that Ross was fired specifically because Campbell Soup Co. believed he did *not* have a disability and was malingering in his time off work. The court found that "there was nothing to put Ross's supervisors on notice that he was disabled, moreover, or to disabuse them of their suspicion that Ross's absences were unjustified, or at least unjustifiably long."

Finally, the district court concluded that Ross had not presented direct evidence of disability discrimination through introduction of the "back case" memo. Rather, the court held that the memo was an "isolated reference . . . ambiguous . . . and . . . not facially derogatory." The court also noted that the comment was written "in connection with a determination of whether Ross should receive a bonus, not in connection with the termination decision," and that it was made after the decision to put Ross on probation, "which led to his ultimate termination."

In dicta, however, the district court indicated that although Ross could not establish a prima facie case of discrimination and the line of argument was therefore irrelevant, "[a]s to Ross's ability to show he was 'otherwise qualified' to perform the job assigned to him, it is clear that Campbell Soup would not be entitled to summary judgment on that issue." The court continued:

Similarly, there are questions regarding the timing of Ross's unsatisfactory performance reviews, the need for placement of Ross on probationary status, the increase in his performance standards during that time period, and the nature of the criticism heaped on Ross which, when combined with the untimely receipt of a COBRA letter and the contents of the internal memoranda discussing Ross, would be sufficient to create a genuine issue of material fact on the question of pretext.

The district court concluded, "While, on the record presented, it appears unlikely, if not impossible, that Ross

would also be able to show that his performance failures were a pretext *for discrimination*, as required by *Hicks*, that question – *i.e.*, the employer's motive – is one rarely susceptible to resolution at the summary judgment stage."

### DISCUSSION

The Americans with Disabilities Act provides that a covered employer may not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2000). In this case, we are persuaded that the district court did not err in concluding that Ross failed to establish that he had a disability within the meaning of the ADA. However, the statute gives the plaintiff three potential avenues to follow in proving he is disabled within the meaning of the Act. He may show that he has a disability as defined by the ADA, that he has a record of having such a disability, or that he is regarded as having such a disability by his employer. *See* 42 U.S.C. §§ 12102(2).

In so constructing the statute, the drafters of the ADA created a vision of membership in a protected class unlike that embodied by other civil rights legislation, such as Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 (2000), or the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623 (2000). Under the third prong of this portion of the statute, an individual may invoke the ADA's protection even if he is not, in fact, disabled. The breadth of the Act's protection is the embodiment of its drafters' will to stamp out the stereotyping of and discrimination against persons with disabilities in all their forms, even when that stereotyping or discrimination is misplaced. Thus, in determining who may invoke the protection of the ADA, we do not always look to the individual claiming discrimination; when that individual seeks to proceed under a "regarded as" theory, we must look to the state of mind of the employer against whom he makes