NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0133n.06
Filed: February 18, 2005

Nos. 03-6219, 03-6351

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JAMES MCELROY,

      Plaintiff-Appellee Cross-Appellant,

           v.

PHILIPS MEDICAL SYSTEMS NORTH
AMERICA, INC.,

      Defendant-Appellant Cross Appellee.

On Appeal from the United
States District Court for the
Middle District of Tennessee

_____/

**Before:**      **GUY, and COLE, Circuit Judges; TARNOW, District Judge.**[*]

      **PER CURIAM.**    Plaintiff, James McElroy, appeals from the entry of summary judgment in favor of his former employer, Philips Medical Systems North America (Philips)[1], with respect to his claims of (1) discrimination based on age and disability in violation of federal and state law, and (2) retaliatory discharge in violation of federal law. Philips appeals from the denial of its motion for summary judgment with respect to plaintiff's state law retaliatory discharge claim, which was dismissed without prejudice when the district court declined to exercise supplemental jurisdiction over the claim.

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]According to defendant, Philips Medical Systems North America is actually a division of Philips Electronics North America Corporation.

After review of the record and the arguments presented on appeal, we **AFFIRM** the decision granting summary judgment to defendant with respect to the age and disability claims; **AFFIRM** the grant of summary judgment to defendant on the federal retaliatory discharge claims; and **REVERSE** both the dismissal of, and the denial of defendant's motion for summary judgment with respect to the state law retaliatory discharge claim.

**I.**

Philips is in the business of selling medical equipment such as x-ray machines, CT scans, and MRIs, to hospitals, medical centers, outpatient clinics, and physicians' offices. In 1985, McElroy, a certified radiology technician, started working as a sales representative for a company that was being purchased by Philips. McElroy became an account manager for Philips in its South Zone (covering parts of Georgia, Kentucky, Arkansas, and Tennessee) and continued in that position until his employment was terminated on September 7, 2001. McElroy received several President's Club awards for his sales record between 1990 and 1997, but was last recognized for his sales in early 1998.

In 1997, McElroy was diagnosed with prostate cancer, received treatment, and returned to work after a brief period of recovery. In 1999, McElroy was diagnosed with colon cancer, had surgery, and returned to work without limitations. McElroy's performance review in March 1998 reflected an overall rating of "Fully Meets Requirements." No review was available for 1999. McElroy did not claim to be disabled, but alleged that he was mistakenly regarded as disabled because of his cancer.

In February 2000, McElroy's direct supervisor was replaced by Dennis Wyatt, who became Regional Manager for the South Zone. At that time, McElroy was 58 years of age

and Wyatt was 50. Wyatt knew McElroy and had worked directly with him as a product specialist in connection with a successful sales effort in 1997. There is no dispute that Wyatt was aware through a mutual friend, Monte Chaille, that McElroy had been treated for cancer.

Wyatt gave McElroy his first unfavorable performance review in March 2000, which reflected an overall rating of "Needs Improvement to Meet Requirements." Areas rated "in need of improvement" included sales volume, forecasting, technical knowledge, and planning and organization. McElroy emphasizes two comments on this evaluation: first, that McElroy was "coming back from serious health problem[s] in 98/99, but now ha[d] a clean bill of health and [was] showing signs of a Top Performer once again"; and, second, that it was a goal for McElroy to "rekindle his skills and impressive style as a top performer." Plaintiff's sales of $5.29 million fell short of the $6 million goal.

Wyatt received complaints both from customers and coworkers about McElroy's lack of account coverage, inadequate product knowledge, and delays in follow-up with customers during 2000. The fact of these complaints was both undisputed and corroborated through affidavits from coworkers and customers. For example, as early as March 2000, Wyatt replaced McElroy on the radiology account at Lourdes medical facility. Complaints from Lourdes were conveyed to Wyatt by Mike Haney, a sales person employed by a company affiliated with Philips. Haney confirmed that this action was taken at the request of the customer.

In early 2000, Steve Gaines, Assistant Director of Radiology at Vanderbilt University Medical Center, and Bryan Brand, Associate Hospital Director at Vanderbilt, expressed displeasure to Wyatt about McElroy's practice of not making appointments before he visited,

the delays they experienced in getting quotes or responses to service requests, and his failure to keep abreast of their needs. Wyatt discussed these concerns with McElroy but, in March 2001, Gaines asked that McElroy be replaced on the account.

Dissatisfaction about McElroy's performance came from within the company as well. Kathy Higginbotham, a CT sales specialist, explained that she worked with McElroy on many occasions and that, in her opinion, McElroy was not knowledgeable about the needs and future plans of his clients or about the company's new products. In an email to Wyatt in May 2001, Higginbotham reported seeing improvement in McElroy's knowledge concerning client needs.

Monte Chaille, also a product specialist with Philips, attested that he felt McElroy was generally not keeping up with the new products or engaging his customers to ascertain future equipment needs. Chaille complained to Wyatt about one incident in particular in which McElroy had told him that a full product presentation would not be required for a customer meeting. When they arrived, however, it turned out that the director of purchasing and the technical support personnel had been expecting a full presentation. Chaille was not prepared and felt the meeting did not go well.

Wyatt conceded that he asked and urged McElroy to retire during the summer of 2000; even suggesting that McElroy take a medical retirement. McElroy responded that he could not afford to retire and that he was physically fine. In September 2000, Wyatt hired Debra Sheridan, age 45, as an account manager in the South Zone. Sheridan had worked in other positions with Philips, including as a product specialist like Wyatt. At the time she was hired, Wyatt told her that McElroy would be leaving Philips within 18 months. Sheridan was

initially assigned accounts from another discharged account manger named Beverly Barts, was later assigned accounts that were taken from McElroy, and was ultimately given more of McElroy's accounts after he was discharged in September 2001. Sheridan did not take over all of his accounts when he was discharged, as they were spread among the then existing account managers. Sheridan left Philips in March 2002.

Plaintiff offered and defendant objected to consideration of an affidavit from Barbara Shockely that was provided for the first time after the close of discovery. Shockely worked as a sales representative in the medical equipment industry and was acquainted with Wyatt, McElroy, and Sheridan. Near the end of 2000, Wyatt told Shockely that McElroy was going to be fired, but asked that she keep the information to herself. In fact, Wyatt's notes reflect that he and his supervisor, Joe Robinson, discussed terminating McElroy's employment at the end of 2000. Those notes also indicate that McElroy and the product specialists "won" several deals in early 2001.

In the March 2001 performance review, Wyatt again gave McElroy an overall rating of "Needs Improvement to Meet Requirements" and identified many of the same problems as the year before. In the closing section, Wyatt wrote that: "Jim has had some very serious health problems that ha[ve] stopped him from performing at the top level." McElroy denies that the signature on this evaluation is his, Wyatt claims he signed McElroy's name with permission after discussing it by telephone.

During the spring of 2001, Philips was vying for the chance to sell a cardiac catheterization laboratory worth several million dollars to Vanderbilt's cardiology department. McElroy remained on this account, but Sheridan also participated in the sales

effort. Philips discovered late in the bidding process that Vanderbilt was making a "site visit" to a competitor located in Germany. Wyatt blamed McElroy for not knowing about that trip and formally reprimanded him on May 21, 2001, for his lack of knowledge. Wyatt also removed McElroy from the account at that time. Philips lost the sale. McElroy felt he was blamed even though Wyatt was at fault for directing him to "skinny down" the quote by taking items out without changing the price. Sheridan testified that she heard Wyatt tell McElroy to change the quote, and that one of the Vanderbilt doctors told her that he did not trust Wyatt.

In June 2001, McElroy was removed from the Caldwell County Hospital account at the request of Dr. Larry Long, the physician primarily responsible for the hospital's purchase of radiology medical equipment. McElroy did not believe Dr. Long had asked for his removal, called Dr. Long directly, and then related to Wyatt that Dr. Long had denied making such a request. In support of defendant's motion for summary judgment, however, Dr. Long affirmatively stated that he told Wyatt that he wanted McElroy off the account; that he did not trust McElroy any longer; and that he would not recommend any purchases of equipment from Philips as long as McElroy was the account manager for Caldwell Hospital.

On July 6, 2001, Wyatt placed McElroy on a 60-day Work Improvement Plan (Plan) in consultation with Robinson and Chana Wade from human resources. The memorandum setting out the Plan indicated that it was being implemented because of "the lack of account coverage, follow-up with customers, sales communication, and lack of new product knowledge during the last year and a half." The Plan required that specific action in eleven different areas be demonstrated within 60 days.

When presented with the Plan, McElroy refused to sign it. According to McElroy, Wyatt urged him to retire and told him he would be fired at the end of the 60 days. McElroy claims that he asked Wyatt to spare him the grief and just fire him, to which Wyatt answered he would have done so earlier if Wade had let him. In the weeks that followed, McElroy was removed as account manager for North Crest Hospital and Jennie Stuart Hospital.

On July 27, 2001, McElroy filed suit in state court alleging discrimination in the terms and conditions of employment because of age and disability in violation of the Tennessee Human Rights Act (THRA) and the Tennessee Handicap Act (THA). *See* TENN. CODE ANN. § 4-21-401 and § 8-50-103(1). The complaint was served on Philips on August 9, 2001.

On August 10, 2001, Wyatt presented McElroy with an evaluation of his progress over the first 30 days that indicated he was not meeting the goals and objectives of the Plan. But, on August 20, 2001, Wyatt advised Wade that plaintiff "seems to be trying to cover his accounts and make a comeback." Wyatt also reported that he had given McElroy a significant number of accounts that needed coverage because of the termination of another employee; that McElroy's goals and objectives dated August 16 "looked good"; and that McElroy had been "proactive" in setting up a computer class that was required by the Plan. Wyatt closed by saying he thought they were "making progress."

On September 7, 2001, at the conclusion of the 60-day period, McElroy was discharged because of the many complaints from customers and product specialists, his overall poor performance and lack of product knowledge, and his failure to meet the requirements of the Work Improvement Plan. According to Wyatt, at that time McElroy had $3,014,451 in sales and was therefore not "on target" to meet the 2001 sales goal of $6

million.  McElroy testified that Wyatt knew he had several more deals in the works, which were closed after his discharge and credited to Sheridan.

On the same day as plaintiff's discharge, Philips removed the lawsuit to federal court on the grounds of diversity jurisdiction because Philips is a Delaware corporation with its principal place of business in New York.  After removal, McElroy filed an amended complaint alleging retaliatory discharge in violation of state law and brought a formal charge with the EEOC asserting age discrimination, disability discrimination, and retaliatory discharge in violation of the Age Disability in Employment Act (ADEA) and the Americans with Disabilities Act (ADA).  *See* 29 U.S.C. § 623(a) and (d); 42 U.S.C. §§ 12112 and 12203.  The EEOC promptly dismissed the charge because of the pending lawsuit and issued a right-to-sue letter on October 4, 2001.  McElroy moved for leave to amend, which was granted in November 2001.  On March 12, 2002, McElroy formally filed the Second Amended Complaint.

In October 2002, after the close of discovery, Philips moved for summary judgment on all claims.  For the reasons set out in its memorandum opinion filed on September 4, 2003, the district court granted in part and denied in part the defendant's motion for summary judgment and dismissed without prejudice the remaining state law retaliatory discharge claim.  Defendant appealed and plaintiff cross-appealed.

## II.

We review a district court's decision to grant a motion for summary judgment *de novo*.  *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).  When the denial of a motion for summary judgment is based solely on legal grounds, our review is also *de novo*.  *Black*

*v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002).  When a motion for summary

judgment is denied on the grounds that there exists a genuine issue of material fact, however,

the decision is reviewed for abuse of discretion.  *Pinney Dock & Transp. Co. v. Penn. Cent.*

*Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988).

**A.       Age Discrimination**

Plaintiff relies on circumstantial evidence to establish age discrimination under the

burden-shifting framework applicable to claims brought under both the ADEA and the

THRA.  *See Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995)

(analysis of age discrimination claims same under THRA and ADEA).  To establish a *prima*

*facie* case of age discrimination, the plaintiff must demonstrate that he (1) was at least 40

years of age; (2) was qualified for the position; (3) suffered an adverse employment action;

and (4) was either replaced by a substantially younger person, or was treated less favorably

than a similarly situated employee from outside the protected class.  *Grosjean v. First Energy*

*Corp.*, 349 F.3d 332, 335 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 2069 (2004).  The district

court found that while plaintiff met the first and third prongs, he failed to meet the second

and fourth prongs of the *prima facie* case.

First, the district court concluded that although McElroy had been an exemplary

employee at one time, he was no longer "qualified" at the time of his discharge because he

was not meeting the expectations of or performing to the satisfaction of his employer.  As

plaintiff observed, this court cautioned in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d

564, 574 (6th Cir. 2003) (*en banc*), that "a court may not consider the employer's alleged

nondiscriminatory reason for taking an adverse employment action when analyzing the *prima*

*facie* case." "To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)). The court clarified that the focus of the qualification prong is on the plaintiff's objective qualifications, and held that this *prima facie* showing may be met by "presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 576.

McElroy argues that Philips has improperly relied on its articulated nondiscriminatory reasons for taking adverse action against him to also demonstrate that he was not qualified for the position of account manager at the time of his discharge. It would overstate *Wexler* to suggest, as plaintiff seems to, that the objective qualifications cannot change or that a past history of satisfactory performance necessarily demonstrates that an employee was objectively qualified at the time of the adverse action. Assuming that McElroy could demonstrate that he remained objectively qualified for the position, we nonetheless agree with the district court that he failed to satisfy the fourth prong of a *prima facie* case of age discrimination.

McElroy contends that he was replaced by Sheridan, a substantially younger person, because she took over some of his accounts both before and after his discharge.[2] Sheridan was hired a year before plaintiff's discharge and was initially assigned accounts that had belonged to another discharged account manager. Although Sheridan testified that Wyatt

---

[2]Although Sheridan was over 40 years of age herself, she was about 12 years younger than McElroy and therefore was significantly younger than him. *See Grosjean*, 349 F.3d at 338-40.

told her McElroy would be leaving, that does not mean Wyatt hired her to replace McElroy.

Sheridan took over some of McElroy's accounts, but the accounts assigned to McElroy at the

time of his discharge were divided between Wyatt and the existing managers. As this court

has made clear, a plaintiff has not been replaced when another employee is assigned to

perform the plaintiff's duties in addition to his or her own, or when the plaintiff's duties are

spread among existing employees doing related work. *Grosjean*, 349 F.3d at 336; *Lilley v.*

*BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992).

Alternatively, McElroy argues that Sheridan was treated more favorably than he

despite the fact that he had higher sales figures than she did at the time of his discharge in

September 2001. It is more than evident, however, that plaintiff's termination did not rest

exclusively on his failure to meet his sales goals. There was no evidence that Wyatt received

similar complaints about Sheridan's performance, nor has McElroy made an attempt to

otherwise demonstrate that he and Sheridan were similarly situated in all relevant respects

at the time of his discharge. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th

Cir.1998); *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir.1992). Because plaintiff failed

to establish a *prima facie* case of age discrimination under the ADEA or the THRA, we

affirm the entry of summary judgment on those claims.

**B.     Disability Discrimination**

Plaintiff maintains that he was discriminated against because of a "perceived"

disability or handicap in violation of the ADA and the THA. Both "disability" under the

ADA and "handicap" under the THA are defined to include being regarded as having a

physical or mental impairment that substantially limits one or more major life activities. *See*

42 U.S.C. § 12102(2); TENN. CODE ANN. § 4-21-102(9)(a).  McElroy apparently claims that

Philips believed his cancer to be an impairment that substantially limited him in the major

life activity of "working."  *Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d

417, 420 (Tenn. 1988) (cancer is an illness that may be regarded as limiting a major life

activity).[3]

One may come under the "regarded as" definition of disability in either of two ways:

(1) when his employer mistakenly believes he has a physical impairment that substantially

limits one or more major life activities; or (2) when his employer mistakenly believes that

an actual nonlimiting impairment substantially limits one or more major life activities.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).  In either case, the employer must

"entertain misperceptions about the individual – it must believe either that one has a

substantially limiting impairment that one does not have or that one has a substantially

limiting impairment when, in fact, the impairment is not so limiting."  Id.; *see also Barnes*

*v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 707 (Tenn. 2000).  Because this inquiry

involves examination of an employer's state of mind, evidence that would be offered to prove

discriminatory intent, including that the employer's reasons were pretextual, may be relevant

to the question of whether the employee was "regarded as" disabled.  *Ross v. Campbell Soup*

*Co.*, 237 F.3d 701, 708 (6th Cir. 2001).

When the major life activity at issue is "working," the plaintiff must show his

---

[3]While the Supreme Court has left open the question of whether "working" qualifies as a major life activity, this court has recognized "working" to be a major life activity.  *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 200 (2002); *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002).

employer regarded him as unable to work in a broad class of jobs. *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 599 (6th Cir. 2002). This is difficult to prove because the plaintiff must demonstrate not only that his employer thought he was disabled, but also that his employer thought his disability would prevent him from performing a broad class of jobs. *Ross*, 237 F.3d at 709. A question of fact was presented on this issue in *Ross* because there was substantial evidence that the plaintiff's medical status played a significant role in his discharge, as well as evidence that the employer concocted a pretextual justification for the discharge. *Id.* Unlike *Ross*, the evidence presented in this case is not sufficient to lead a rational trier of fact to find Philips believed McElroy had a disability that would prevent him from performing a broad class of jobs.

There was evidence in *Ross* that the director of the plaintiff's division prepared and circulated a memorandum titled "Dale Ross Back Injury History," which detailed five work-related back injuries and the corresponding periods of disability. Ross returned to work under threat of termination, immediately received his first negative performance evaluation, and was placed on probation for 90 days during which he was required to meet significantly higher goals and objectives. During the probationary period, management circulated a memorandum concerning the denial of a bonus for plaintiff. On that memo one supervisor wrote: "When can we bring this problem person to a termination status[?] P.S. – Back Case." *Ross*, 237 F.3d at 704.[4]

---

[4]Similarly, this court found a question of fact on this issue in a case brought under the THA in which the plaintiff was discharged from her position as a personnel assistant five days after being hospitalized for taking an overdose of pills, where there was evidence that her supervisor discharged her because this behavior demonstrated a lack of responsibility and he felt he could not trust her to handle the duties of her job. *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 824 (6th Cir. 2002).

Arguing that a question of fact exists in this case, McElroy emphasizes that Wyatt was aware of his bouts with cancer; made reference to his "serious health problems in 98/99" and the need to "rekindle his skills" in the March 2000 performance review; and urged him to retire, even to take medical retirement, during the summer of 2000. McElroy also relies on evidence that Wyatt predicted his departure and even his discharge as much as a year before his employment was finally terminated. This, however, is not substantial evidence that McElroy's history of cancer played a "significant role" in his discharge. Moreover, there is independent evidence that Wyatt received consistent complaints from both customers and coworkers about McElroy's job performance that were unrelated to any physical impairment.

Without disputing the bulk of those complaints, McElroy testified that Wyatt instructed him to concentrate his time on Vanderbilt, even if it affected his smaller accounts, and assured him the smaller accounts would get the coverage they needed. According to Wyatt, he instructed McElroy to temporarily devote 60% of his time to Vanderbilt while they were trying to win the cardiac catheterization deal during the spring of 2001. McElroy also complains that he was unfairly reprimanded for losing the Vanderbilt sale when it was actually Wyatt's fault. The reprimand was not actually for losing the deal, but McElroy was removed from the Vanderbilt cardiology account.

Taking the evidence together and in the light most favorable to plaintiff, there is, at best, a weak inference that Wyatt may have believed McElroy's past health problems had affected his performance as an account manager. As we explained in *Cotter*, however, "an employer does not necessarily regard an employee as disabled 'simply by finding the employee to be incapable of satisfying the singular demands of a particular job.'" 287 F.3d

at 599 (citation omitted). The evidence simply is not sufficient to lead a rational trier of fact

to conclude Philips regarded McElroy as having an impairment that prevented him from

performing a broad class of jobs. As such, summary judgment was properly entered in favor

of Philips on the disability discrimination claims brought under the ADA and the THA.

## C.      Retaliation

McElroy relied on the burden-shifting analysis applicable to retaliation claims brought

under the ADEA, the ADA, and the THRA to demonstrate that he was discharged in

retaliation for asserting claims of discrimination based on age and perceived disability. To

establish a *prima facie* case of retaliation, the plaintiff must show that (1) he engaged in

protected activity, (2) the defendant knew of such activity, (3) the defendant took an adverse

employment action, and (4) there was a causal connection between the protected activity and

the adverse employment action. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381

(6th Cir. 2002) (ADEA); *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997) (ADA); *Smith v.

Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999) (THRA). Despite this

common test, the district court reached different conclusions with respect to the federal and

state law retaliation claims.

On the THRA claim, the district court concluded that McElroy had demonstrated a

question of fact as to whether a causal connection existed between the protected activity,

which was the filing of the original complaint in state court on July 27, 2001, and his

discharge on September 7, 2001. As for the federal claims, however, the district court found

a causal connection could not be established because McElroy did not file an EEOC charge

asserting the federal claims until October 2, 2001. With the entry of summary judgment on

all the other claims, the district court then declined to exercise supplemental jurisdiction and dismissed the state law retaliatory discharge claim without prejudice.

### 1.      State Law Retaliation Claim

First, the dismissal of the remaining state law retaliation claim was error because the district court had independent federal jurisdiction over the claim based on diversity of citizenship.  A state law claim should be dismissed without prejudice when the federal court has jurisdiction over it solely by virtue of supplemental jurisdiction and all federal claims have been dismissed before trial.  *Faughender v. City of N. Olmsted*, 927 F.2d 909, 917 (6th Cir. 1991); *see also Hankins v. The Gap, Inc.*, 84 F.3d 797, 802-03 (6th Cir. 1996) (when all federal claims have been dismissed at a pretrial stage and the parties are non-diverse, the district court should decline to exercise supplemental jurisdiction over the surviving state law claims).  Here, however, the original complaint asserted only state law claims and removal was based on diversity jurisdiction.

This brings us to the defendant's main contention on appeal, that the district court erred in denying its motion for summary judgment with respect to the state law retaliation claim.  Philips seeks reversal on the grounds that (1) no reasonable juror could find that a causal connection existed between the protected activity and the discharge, and (2) it was error to find a jury submissible claim without completing the full burden-shifting analysis since Philips articulated legitimate nondiscriminatory reasons for McElroy's discharge.

The causal connection required by the fourth prong of the *prima facie* showing may be met by "presenting direct evidence of a causal link, such as where the employer was acting pursuant to an established policy or where the employer admitted the reason for the

termination, or by presenting compelling circumstantial evidence." *Austin v. Shelby County Gov't*, 3 S.W.3d 474, 480-81 (Tenn. Ct. App. 1999). That burden cannot be met "merely by showing that the plaintiff's participation in protected activity was followed by a discharge from employment, even where the proximity in time between the two events is very short." *Id.* (citing *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997) (six days); and *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995) (three days)).

McElroy offered no direct evidence of a causal link in this case. Instead, McElroy relied solely on the temporal relationship between the filing of the complaint in state court and his discharge about a month later. This, standing alone, will not support an inference that the protected activity and discharge were causally related. In fact, as McElroy himself maintained, there was evidence that his discharge was contemplated and underway before he engaged in the alleged protected activity. Wyatt received complaints and raised concerns about McElroy's performance as early as March 2000; indicated to others as much as a year earlier that McElroy would be leaving the employ of Philips; and, according to McElroy, told him on July 6, 2001, that the Work Improvement Plan would end with his termination. Given the evidence in this case, it was an abuse of discretion for the district court to find McElroy had presented sufficient evidence to create a genuine issue of material fact as to whether there was a causal connection between the filing of the complaint and his discharge.

## 2.      Federal Retaliation Claims

Finally, McElroy has challenged the district court's decision granting summary judgment to Philips on the retaliatory discharge claims asserted under the ADEA and the ADA. The district court found that the filing of the EEOC charge on October 2, 2001, could

not have motivated his discharge a month earlier. Without citing to any authority or fleshing out the argument, McElroy asserts that the filing of the original complaint alleging claims of age and disability discrimination under the THRA and the THA should qualify as "protected activity" under the ADEA and the ADA. He argues that the state law discrimination complaint is the "functional equivalent" of a complaint under the ADA and ADEA.

The ADEA and ADA, like Title VII, prohibit retaliation against an individual because he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding," hearing, or litigation "under this chapter." 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a). This court has held, in the context of Title VII, that "the instigation of proceedings leading to the filing of a complaint or a charge, including 'a visit to a government agency to inquire about filing a charge' is a prerequisite to protection under the participation clause." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (internal citation omitted); *see also Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003) (participation in internal investigation conducted pursuant to a pending EEOC charge is protected activity).

While our research reveals no cases in which the filing of an action alleging discrimination in violation of state law has been held to be protected under the participation clause of Title VII, the ADEA, or the ADA, we need not resolve the issue in this case because plaintiff has failed to make the requisite showing of a causal connection between the filing of the original complaint and his discharge a month later.

To show the causal connection necessary to make out a *prima facie* case of retaliation under the ADEA or the ADA, McElroy must produce sufficient evidence to support an

inference that his employer would not have discharged him if he had not filed the complaint in state court. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). As discussed above, McElroy relied solely on the temporal proximity between the filing of the complaint and his discharge to make this showing. Federal standards are clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). In fact, as we found with respect to the state law retaliation claim, McElroy maintained that his discharge was both contemplated and had been set in motion before he filed the original complaint alleging the state law claims of discrimination. *See, e.g., Cox v. Sci. Applications Int'l Corp.*, No. 99-3691, 2000 WL 977309 (6th Cir. July 6, 2000) (unpublished) (no inference of a causal connection where criticisms and clash preceded the protected activity and plaintiff alleged a prior plan to discharge him). Absent a showing of a causal connection, plaintiff would not be able to make a *prima facie* case of retaliation and summary judgment was properly entered on his claims of retaliation in violation of the ADEA and the ADA.

Accordingly, we **AFFIRM** the decision granting summary judgment to defendant with respect to the age and disability discrimination claims brought under state and federal law; **AFFIRM** the grant of summary judgment on the retaliatory discharge claims made under federal law; and **REVERSE** both the dismissal of, and the denial of summary judgment with respect to, the state law retaliatory discharge claim.