NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0310n.06

**No. 08-3779**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**May 20, 2010**
LEONARD GREEN, Clerk

TERESA WATTS,                                  )
                                               )
    Plaintiff-Appellant,                       )        ON APPEAL FROM THE
                                               )        UNITED STATES DISTRICT
    v.                                         )        COURT FOR THE SOUTHERN
                                               )        DISTRICT OF OHIO
UNITED PARCEL SERVICE,                         )
                                               )
    Defendant-Appellee.                        )        **OPINION**
_____                )
                                               )

Before:  KENNEDY, MOORE, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**  In this employment discrimination action, Plaintiff

Teresa Watts appeals from the district court's orders granting Defendant United Parcel Service

(UPS) judgment as a matter of law on Watts' "regarded as" disability claim, denying Watts' motion

for judgment on the special verdicts returned on her sex discrimination claim after the first of two

jury trials, and granting UPS a new trial on the sex discrimination claim.  We **AFFIRM** in part and

**REMAND** for new trial on the disability claim.

FACTS AND PROCEDURAL HISTORY

Teresa Watts began working for UPS in 1990 at its Hamilton, Ohio, facility.  In April 1999

Watts became a package car driver.  Between 1999 and 2004, Ms. Watts was the only female among

the 29 full-time package car drivers at the Hamilton facility.

In June 2000, Watts sustained a serious back injury while unloading her delivery truck. Watts was initially found to have an acute back sprain; she was later diagnosed with a disc herniation. Watts was placed on leave and was unable to return to work for nearly two years as result of her injury. UPS certified the injury as work-related and provided care. For approximately a year of that time, Watts received workers' compensation benefits including health insurance and temporary total disability (TTD) payments in the amount of 60% of her regular salary. After the year, Watts no longer received medical insurance or pension benefits through the company, but continued to receive the TTD payments. Also, the treatment for her work-related injury continued to be covered by UPS. UPS continued to approve various treatments for Watts' injury until July 2002. During that period, Watts' physicians represented to UPS that Watts remained unable to work, and submitted estimated possible return-to-work dates to UPS.

According to Watts, at some point in Spring 2002 she began a physical therapy program in order to get stronger, with the intention of returning to work. In July 2002, UPS sent Watts to an independent medical examination to determine whether she had reached "maximum medical improvement" as defined by the Ohio Bureau of Workers' Compensation (BWC). The independent examiner, Dr. Mullens, determined that Watts had reached maximum medical improvement – allowing UPS (after the requisite BWC proceedings) to terminate Watts' TTD payments. Dr. Mullens also noted that Watts had related to him that she was very much interested in returning to work and that she felt she could perform her duties. He recommended "a gradual return to the normal work place with the ability to perform unrestricted work, however, in a restricted time

frame," for example, "a 20 hour work week gradually building up to a normal 40 hour work week over an eight week period of time." (Appendix (App.) 484.)[1]

Watts' TTD payments were terminated in November 2002. At this point, the parties' accounts diverge. Watts claims that by then she was ready and able to return to work. She cites Dr. Mullens' July 2002 assessment and a November 2002 release to return to work part time with restrictions by her treating physician. (App. 485). At trial, UPS Case Manager Supervisor Andrew Germann admitted that he knew Watts wanted to return to work as of Fall 2002. (App. 186.) In contrast, UPS contends that even after Watts' TTD benefits stopped, Watts and her doctors continued to indicate that she could not work in any capacity. UPS cites 1) Watts' December 2002 appeal of the cessation of her TTD benefits, which UPS views as "an indication that she and her doctors believed she was unable to return to her package car position or to work light-duty," 2) Watts' November 2002 application for Social Security disability benefits, which required Watts to affirm that she was currently disabled and that she "became unable to work because of [her] disabling condition on June 29, 2000," and 3) Watts' February and September 2003 requests to reconsider the denial of the application. (App. 508, 511-12).

Beginning around November 2002, Watts sought to participate in UPS's light-duty Temporary Alternative Work (TAW) program for employees recovering from on-the-job injuries. (App. 296.) For two years, UPS refused to grant Watts' requests to return to work (via the TAW program). Watts testified that she was initially told that she first needed a full return-to-work

---

[1]The parties submitted separate appendices, but paginated them consecutively. We will simply refer to appendix documents by their page number.

medical release, and was later told that there was no work for her to do. (App. 296-97.) Watts' union steward also received similar information from UPS.[2] At trial, UPS Case Manager Supervisor and TAW decision-maker Andy Germann explained the reasons for each denial. According to UPS, the TAW program has two eligibility requirements – 1) that the employee's injury is work-related according to the BWC, and 2) that the employee has a full medical release to return to normal duty with no restrictions within 30 days. With regard to Watts' November 2002 doctor's release, UPS concluded that because the doctor stated that Watts would not be able to return to her package car position without restrictions until three months later, she did not meet the 30-day requirement. Watts submitted December 2002 and January 2003 doctor's releases that did meet the 30-day requirement. (App. 192-93, 513.) However, UPS concluded that because Watts – after receiving a new diagnosis of degenerative disc disease in December 2002 – was then being treated for a non-allowed (*i.e.*, not work-related) condition, she was not eligible for TAW.[3] (App. 192-93.)

---

[2]Union steward Gary Abraham testified that Gary Kaufmann, business manager of the Hamilton facility, gave him varying reasons for denying Watts' requests. Abraham testified that, over the course of several conversations with Kaufmann, Kaufmann told him 1) that he did not have any work for Watts at that time, 2) that Watts needed a full unconditional release to return from work, 3) that it was "out of [Kaufmann's] hands," and 4) that Kaufmann thought Watts was only coming back to re-establish her insurance benefits. (App. 68-71.) Watts also testified that she heard a phone conversation between Kaufmann and Abraham (Abraham had included her via a three-way call) in which Kaufmann told Abraham that he "couldn't afford to take [Watts] back," and that Abraham's request was "falling on deaf ears." (App. 299.) At trial, Kaufmann testified that he did not remember the content of any conversations with Abraham about Watts, but specifically denied telling Abraham that he did not have any work for Watts, that Watts needed an unconditional release to return, that he could not afford to take Watts back, or that Abraham's request was falling on deaf ears. (App. 276-78.)

[3]Around this point, Watts filed with the BWC to add annular tears and a herniated disc, then later "degenerative disc disease," to her claim. In July 2003, the BWC hearing officer allowed Watts

Watts testified that UPS never told her that she was denied because she was being treated for a non-allowed condition. (App. 297.) Watts also offered the testimony of three male UPS package drivers, James Schroot, Thomas Heineman, and Gary Abraham, whom she argued were assigned to TAW without meeting the two eligibility requirements UPS cited. (Appellant's Br. 15-17.)

In January 2003, Watts filed a union grievance alleging discrimination, which was denied. (App. 487-88.) According to Watts' trial testimony, after the grievance hearing, UPS Labor Manager Pete Dames suggested that Watts seek an accommodation for a disability under the ADA.[4] (App. 308-09.) Watts officially requested a job-related accommodation in March 2003. (App. 308-09, 490-91.) In July 2003, UPS officials in its Chicago regional office (not including the TAW decision-makers at the Hamilton facility) denied Watts' request because she was not eligible for an accommodation under the ADA. (App. 492.)

In March 2003, Watts filed a charge of discrimination with the EEOC alleging sex and disability discrimination (App. 493.) She filed a second charge of discrimination in July 2003 alleging sex discrimination and retaliation (App. 494). In August 2003, Watts filed suit in federal

---

to add the annular tears and herniated disc claims and found them to be work-related. The hearing officer found that the degenerative disc disease was not a part of Watts' work-related injury and denied treatment (including work hardening) for it. (App. 552-55.) In December 2003, Watts requested to add "aggravation of pre-existing degenerative disc disease" as an allowed claim. In February 2004, the hearing officer found that the condition was not directly or causally related to Watts' workplace injury and denied the request. (App. 561-62.)

[4]Dames testified that he did not "suggest" that Watts seek an ADA accommodation, but rather that he gave her the information because the subject came up at the grievance hearing.

court alleging sex and disability employment discrimination and retaliation in violation of federal and state laws.

In July 2004, the BWC changed course somewhat and concluded that the medical treatment Watts was receiving "is directed toward the allowed condition of annular tears and disc herniations." (App. 567.) This meant that Watts was now being treated for a work-related condition. UPS appealed the decision and lost. In November 2004, Watts' doctor submitted a release to UPS stating that Watts could return to light-duty work for four hours per day. (App. 572-73.) After clarifying with Watts' doctor that she would be able to return to work with no restrictions within 30 days, UPS approved Watts for the TAW program. Watts began TAW on December 4, 2004. Thereafter she returned to her driver position.

The district court conducted a jury trial in March 2006. At the conclusion of Watts' case-in-chief, UPS moved for judgment as a matter of law on all claims. After hearing oral argument, the district court granted the motion with regard to the disability discrimination claim and denied the motion with regard to the sex discrimination and retaliation claims. At the conclusion of the trial, the district court gave the jury charge and submitted special verdict forms to the jury. The jury returned a verdict finding Watts entitled to $140,504.40 in back pay and $60,000 in "other" damages. However the jury's yes/no special verdict answers were contradictory. Both parties moved for judgment, offering different interpretations of the jury verdict. In March 2007, the district court granted judgment in favor of UPS on the sex discrimination claim, set aside the special verdicts concerning retaliation and amount of damages, and ordered a new trial on the retaliation claim. *Id.*

Watts moved for a new trial on the sex and disability discrimination claims. After receiving briefing from both parties and holding a hearing, the district court granted Watts' motion as to the sex discrimination claim, and denied it as to the disability discrimination claim.

In April 2008, the district court[5] conducted a second jury trial on the sex discrimination and retaliation claims. The jury returned a verdict in favor of UPS. Watts timely appealed the district court's final judgment. Concerning her disability discrimination claim, Watts challenges the district court's decision granting judgment as a matter of law to UPS and its later order partially denying her motion for new trial. With regard to the sex discrimination claim, Watts challenges the district court's order denying her motion for judgment on the special verdicts.

**DISCUSSION**

I.      "Regarded As" Disability Discrimination Claim

      A.      Standard of Review

The district court granted UPS judgment as a matter of law on the plaintiff's Americans with Disabilities Act (ADA) claim, before submission to the jury, pursuant to the defendant's motion under Federal Rule of Civil Procedure 50(a). Such decisions are reviewed de novo. *See Diamond v. Howd*, 288 F.3d 932, 935 (6th Cir. 2002). "In entertaining a motion for judgment as a matter of law, the court is to review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." *Jackson v. FedEx Corporate Services, Inc.*, 518 F.3d 388, 392 (6th Cir. 2008) (citations omitted).

---

[5]By the parties' consent, the magistrate judge presided over the second trial.

Judgment as a matter of law becomes appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). "In other words, the decision to grant judgment as a matter of law or to take the case away from the jury is appropriate whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999) (citations and quotations omitted).

      B.     "Regarded As" Disability Law

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A first step then involves determining whether the plaintiff has a disability. *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996).[6] In this regard, the ADA provides the following:

> (2) Disability
> "The term "disability" means, with respect to an individual--

---

[6]Because Watts presents circumstantial evidence in order to meet her burden, the *McDonnell Douglas* burden-shifting framework applies, requiring Watts to first make out a prima facie case. *See Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007). To establish a prima facie case of discrimination in violation of the ADA, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* at 365 (citation omitted).

>   (A) a physical or mental impairment that substantially limits one or more of the
>   major life activities of such individual;
>   (B) a record of such an impairment; or
>   (C) *being regarded as having such an impairment.*

42 U.S.C.§ 12102 (2008) (emphasis added).[7]  Watts claims that she falls under § 12102(2)(C) – that

is, she claims not that she actually was disabled, but that she was so regarded by her employer.

Putting together the requirements of subsections (A) and (C), Watts must show that her employer

regarded her as having a physical or mental impairment that substantially limits one or more of her

major life activities.  The Supreme Court has explained,

>   There are two apparent ways in which individuals may fall within this statutory
>   definition: (1) a covered entity mistakenly believes that a person has a physical
>   impairment that substantially limits one or more major life activities, or (2) a covered
>   entity mistakenly believes that an actual, nonlimiting impairment substantially limits
>   one or more major life activities.  In both cases, it is necessary that a covered entity
>   entertain misperceptions about the individual – it must believe either that one has a
>   substantially limiting impairment that one does not have or that one has a
>   substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999).

Watts alleges that UPS regarded her as disabled with regard to the major life activity of

working.  "When the major life activity under consideration is that of working, the statutory phrase

'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad

class of jobs."  *Id.* at 491.   The plaintiff's disability must be viewed as "significantly

---

[7]In 2008, the ADA was modified by the Americans with Disabilities Act Amendment Act
("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553.  The act broadened the definition of disability
in § 12102, and Watts claims that the amended version should be applied to her appeal.  However,
we have recently held that "the ADA Amendments Act does not apply to pre-amendment conduct."
*Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009).

restrict[ing][her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 452 (6th Cir. 2007) (citing 29 C.F.R. § 1630.2(j)(3)(i)); *see also Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 568 (6th Cir. 2009) ("[T]he inability to perform a single, particular job does not constitute a substantial limitation on [a plaintiff's] life activity of working."); *Sutton*, 527 U.S. at 492 ("[O]ne must be precluded from more than one job, a specialized job, or a particular job of choice.").

> This court has explained the challenges that this inquiry poses:
>
> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. Whether Ross is such a plaintiff lies in the question of whether Campbell Soup Co. regarded him as substantially limited from performing a broad class of jobs. In cases such as this one, where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute. We therefore conclude that Ross has presented sufficient evidence to create a genuine issue of material fact as to the company's state of mind during the events that led to his firing.

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) (entitling the plaintiff, who alleged back pain, to a jury trial under the circumstances). Because a "regarded as" prima facie case turns

upon the employer's state of mind, evidence of pretext – generally used in a post-prima-facie case inquiry evaluating motive or discriminatory intent – can help a plaintiff make out a prima facie case that the defendant employer regarded him or her as disabled. *Id*. at 708.

When a defendant flatly bars a plaintiff from working at any job at the defendant's company, that is generally sufficient proof that the employer regards the plaintiff as disabled in the major life activity of working so as to preclude the defendant being awarded judgment as a matter of law. For example, in *Wysong v. Dow Chemical Co.*, 503 F.3d 441 (6th Cir. 2007), a panel considered the plaintiff's claim that she was told by her employer Dow that because of her "condition of drug dependency," she could not return to work "until she was completely off pain medications" and had received "a [medical] release to work without restrictions." *Id*. at 453. When this was combined with the fact that Dow did not offer Wysong any other job at the company, the court concluded that "[a] reasonable fact finder could conclude that, under the facts presented, Dow perceived Wysong as being unable to work anywhere at the plant, and thus, unable to perform the same broad class of work anywhere else." *Id.* This court reached the same result in *Henderson v. Ardco, Inc.*, 247 F.3d 645 (6th Cir. 2001). In *Henderson*, the plaintiff returned to work with a letter from the doctor that included restrictions on her physical capacities. The Ardco plant manager did not permit Henderson to resume work and explained, "You know what company policy is . . . you have to be 100 percent to work here." *Id*. at 647. The panel concluded that because the defendant had essentially told the plaintiff that there was no job for her anywhere in the company until she was completely healed, there was sufficient evidence that the defendant regarded her as disabled in a wide spectrum of jobs to defeat the defendant's motion for summary judgment. *See, id.* at 654.

In contrast, it is insufficient for a plaintiff to merely show that he or she was regarded as disabled in the sense of being unable to do one particular job or even a narrow class of jobs. *See, e.g., Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 706 (6th Cir. 2008) (granting summary judgment, when defendant employer believed plaintiff's back condition and medication levels precluded him from "performing the dangerous machinery functions required of the particular job of maintenance technician . . . but did not regard him as unable to perform a broad class or range of jobs in the maintenance field or other categories of employment"); *McKay v. Toyota Motor Mfg. U.S.A., Inc.*, 110 F.3d 369, 373 (6th Cir. 1997) (concluding that carpal tunnel syndrome, which only prevented the plaintiff from performing a narrow range of assembly-line jobs, was not an impairment that substantially limited her general ability to work); *Mahon v. Crowell*, 295 F.3d 585, 591-92 (6th Cir. 2002) (concluding that a plaintiff with a history of back problems nonetheless was not substantially limited in his ability to work in a broad class of jobs); *Black v. Roadway Express, Inc.*, 297 F.3d 445, 454-55 (6th Cir. 2002) (concluding that a plaintiff's knee injury did not prevent him from performing a broad class of truck driving jobs).

C.     Analysis

The district court concluded that UPS did not regard Watts as disabled, and granted UPS's motion for judgment as a matter of law. The court briefly explained,

> This Court also eliminates the ADA claim. Under the evidence as it exists now from
> Plaintiff's point of view, and I've reviewed it at the time of the summary judgment

as well as here, she was perceived solely that she could not do the job at the given time. It wasn't a permanent situation; it wasn't a long-term situation.[8]

(App. 107.)

Watts contends that there are several sources of evidence from which a jury could have concluded that TAW decision-makers at UPS regarded her as disabled. She argues that the fact that she was consistently denied TAW despite the documentation by physicians that she could return to work demonstrates that the denial decisions were not based on medical conclusions about her condition, but rather stereotypes about her injury. She points to Business Manager Kaufmann's statement that he did not have a job for her and that he would not return her to work until she could provide a full and unconditional medical release as describing the same type of "100%-healed" rule present in *Henderson*. Watts also contends that UPS's nondiscriminatory reasons for her being denied TAW are pretext because the two eligibility requirements the company states are not legitimate program requirements and have not been applied to others who qualified for TAW

---

[8]Directly after making this statement, the district court referenced as the "ADA situation" Watts' being denied disability accommodation by UPS regional officials, causing Watts to argue that the district court incorrectly understood *that* to be her disability claim rather than her "regarded as" claim based upon UPS's November 2002-November 2004 TAW denials. However, Watts twice clarified her claim to the court, once during the argument immediately after the court made the above statement, App. 108-09, and also when Watts filed the motion for new trial. At the hearing on UPS's motion for judgment as a matter of law, the court more or less maintained its original position, stating "To me, Ms. Watts is not disabled. She may have been retaliated against, she may have had sex discrimination, but she wasn't discriminated against because of any disability or any perceived disability." (App. 110.) In denying the motion for new trial, the court noted its approval of the arguments advanced in UPS's briefing, which had included that UPS did not consider Watts' abilities to perform in a broad range of jobs, and that the company's statements and TAW denials represented at most the determination that Watts could not do her job within thirty days. (App. 630; R. 114 at 8-11.)

positions. Finally, Watts argues that Labor Manager Dames' suggestion that she seek an accommodation for her disability under the ADA, is evidence that UPS officials regarded her as disabled.

UPS counters that all decisions made concerning Watts' participation in the TAW program were based upon the program requirements and documentation submitted by Watts' physicians. The company argues that even if it did misperceive Watts' ability, Watts could not have met the standard because the company never assessed Watts' ability with regard to whether she was precluded from working in a broad range of jobs. Company officials only considered her potential participation in TAW, which only involved an evaluation of her ability to perform the essential functions of her regular job within 30 days. Finally, UPS argues that even if Dames and Kaufmann did make the statements Watts claims they did, UPS is still entitled to judgment as a matter of law because the men are not sufficiently connected to the TAW decision-making process.

The TAW program involved a broad range of light duty jobs – Watts' potential participation in it would certainly mean that UPS did not regard her as disabled. But, UPS did not allow Watts to participate in TAW from November 2002 (when UPS first denied TAW) to December 2004 (when Watts was given a TAW assignment). To justify its denials, UPS relies on Watts' failure to meet the two eligibility requirements of the TAW program: 1) that Watts be able to return to full duty (in her regular job) within 30 days, and 2) that Watts' injury must be one that the Industrial Commission of the Ohio Bureau of Workers' Compensation (BWC) has determined is a work-related injury. UPS contends that the requirements come from the collective bargaining agreement (CBA) between Watts' union and the company. The BWC-certified work-related-injury requirement is derived from

the CBA provision which describes TAW as a "program designed to provide temporary work opportunity to those employees who are unable to perform their normal work assignments *due to an on-the-job injury*." (App. 517.) The 30-day-full-duty requirement comes from the CBA's rules on seniority, specifically that because any UPS job with a duration of 30 days or more becomes a permanent job that can be bid upon, in order to keep TAW jobs for temporarily injured workers, UPS must limit TAW jobs to 29 days. (App. 518.) UPS explains that "[b]ecause of the seniority rule, the information from the employee's treating physician must demonstrate that the employee will likely be able to perform the essential functions of her job within a 30-day work period to be eligible for TAW." (Appellee's Br. 3-4.)

There is reason to question the legitimacy of these eligibility requirements – particularly the 30-day-full-duty requirement. Even assuming that the CBA does dictate TAW rules, the full-duty requirement as the company states it does not follow from the CBA seniority provision.[9] The need to limit a TAW job to 29 days or less does not necessitate the additional requirement that the worker who had filled that job return to her regular job without restriction. Indeed, at least two other UPS employees testified that they did not return to full-duty work in their previous position after working their TAW periods. *See* Testimony of Jim Schroot, App. 39 (stating that he did not go back to work after TAW for one of his injuries and that no one at UPS informed him he would need to return to

---

[9]One of the ways by which a plaintiff demonstrates pretext is "by showing that the employer's stated reason for the adverse employment action . . . is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009).

full duty within 30 days); Testimony of Gary Abraham, App. 73 (stating that when he worked TAW he did not have an unconditional release to go back full-time).

The 30-day-full-time requirement is also problematic because it conflicts with language in another UPS document describing TAW. A document entitled "Temporary Alternate Work" that Watts maintains is UPS's written policy on TAW, does not contain the 30-day-full-time requirement, and specifies that "TAW can occur at any time." (App. 497.) UPS argues that the document is not UPS's written TAW policy and that any conflict must be resolved in favor of the CBA agreement. Considering the evidence in the light most favorable to Watts, however, a jury could have found that the document does represent UPS policy.[10] Further, the document only necessarily conflicts with the guideline that UPS has *extrapolated from* the CBA agreement; there is no necessary conflict with the CBA seniority provision itself, which would merely prevent TAW from lasting longer than 29 days. Accordingly, viewing the evidence in the light most favorable to Watts, there is reason to conclude that UPS's TAW denials – at least any that depended on the 30-day-full-duty requirement – are pretext.

---

[10]UPS argues that the document is not UPS's written policy on TAW because most UPS witnesses had not seen it until just before trial, none identified it as such at trial, and it conflicts with the way in which UPS administers TAW. However, Germann, the individual who according to UPS was responsible for TAW decisions, reviewed the document during his training and was told to be familiar with it. (Germann Testimony, R. 70 at 8-12.) In addition, the CBA states that any TAW program "shall be reduced to writing." (App. 517.) UPS did not offer any alternative written documents describing UPS's TAW program, leaving the document Watts cites as the only UPS document (excluding the CBA between UPS and the union) describing the TAW program in the record.

As in *Ross*, there is significant evidence that the reasons supporting the employer's adverse action were illegitimate.[11] *Ross* instructs that this type of pretext evidence "may tend to prove that [an employer] regarded [its employee] as a disabled employee." 237 F.3d at 708.[12]

Watts further argues that two additional pieces of evidence link UPS's TAW denials to a perceived disability. She points to 1) Kaufmann's statements that he did not have any work for her at that time, and that he would not return her to work until she could provide a full and unconditional medical release, and 2) Dames' suggestion that she seek an accommodation for her disability.[13] UPS argues that the statements are not relevant to showing the company's perception of Watts in refusing to grant TAW because neither Kaufmann nor Dames is a TAW decision-maker. This is probably true as to Dames. Although the written TAW document lists Dames' position (Labor Manager) among the eight personnel positions that select and approve TAW assignments, there is no evidence that Dames took part in the decisions not to grant TAW to Watts. The record is mixed as to Kaufmann's

---

[11]In *Ross*, the plaintiff was fired after receiving negative performance evaluations and falling well short of sales goals. But, Ross's employer had greatly increased his sales goals after Ross had missed work due to a back injury. There was other evidence that the employer had stacked the deck against Ross – while still employed, Ross received a letter notifying him of his eligibility for COBRA benefits, and Ross's supervisor asked another official when they could "bring this problem person to a termination status." *Id*. at 704.

[12]*See id*. at 709 ("the implications of Campbell's pretext are twofold: first it provides evidence as to the company's discriminatory intent in firing Ross, and second, because it tends to prove discriminatory intent, the evidence of pretext may also tend to show that Campbell Soup Co. regarded Ross as disabled.").

[13]At trial, Watts and Abraham testified that the statements were made. Although both Kaufmann and Dames denied making the statements, *see supra* notes 2 & 4, because the evidence must be construed favorably to Watts, we consider these statements.

role.[14] In any case, Watts also testified at trial that Germann said both that she needed a full return-to-work notice and that there was no work available for her. (ROA 296-97.) It is undisputed that Germann was a TAW decision-maker.

In *Henderson*, this court interpreted an injured employee being told that she had to be "100%" to work there as tending to indicate that the defendant regarded her as disabled in a wide spectrum of jobs sufficient to defeat the defendant's motion for summary judgment. *See Henderson,* 247 F.3d at 654. Similarly, in *Wysong* this court interpreted an employer's statement that the plaintiff could not return to work until she had received "a [medical] release to work without restrictions" as evidence that the defendant "perceived Wysong as being unable to work anywhere at the plant, and thus, unable to perform the same broad class of work anywhere else." *See Wysong,* 503 F.3d at 453. The Kaufmann/Germann statements here – that there was no work for Watts unless she could present a full medical release – present a situation similar to the full-medical-release requirement in *Wysong* and the 100% rule in *Henderson*. The jury could have concluded that the statement indicated that UPS perceived Watts as being unable to perform the broad class of jobs available at the UPS Hamilton facility.

---

[14]Like Dames', Kaufmann's position is included in the list of decision-makers on the TAW document. But, Kaufmann and Germann describe Kaufmann's role as limited to informing Germann – after Germann had determined that an employee was eligible for TAW – whether there was a TAW job available. And Watts affirmed this understanding on cross-examination. (ROA 339.) Still, both Watts and Abraham testified that they had a lot of contact with Kaufmann in the TAW process. (ROA 67-68, 296-97.) And, at trial the district court denied UPS's motion to exclude Kaufmann's testimony on the ground that he was not a decision-maker. (ROA 267-68.)

Alternatively, the jury could have interpreted the statement to reflect the more limited understanding that there were no *TAW* jobs for Watts. This would not necessarily defeat Watts' claim. The testimony revealed that TAW jobs encompassed many types of light duties, including answering phones, filing, gassing up and washing vehicles, and that injured workers holding varied regular positions had access to the program. Thus, a jury could conclude that UPS's consistent pretextual denials of TAW reflected that it regarded her as unable to perform in a broad class of jobs.

The jury heard evidence from which it could infer that UPS believed that Watts had a substantially limiting impairment when, in fact, her impairment was not so limiting. Accordingly, we cannot agree with the district court that there was no legally sufficient evidentiary basis for a reasonable jury to find for Watts on that issue. *Compare Ross*, 237 F.3d at 706 ("Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And . . . that question – *i.e.*, the employer's motive – is one rarely susceptible to resolution at the summary judgment stage.") (quotation marks omitted). Accordingly, we remand for a new trial on Watts' disability claim.

II.    Harmonizing the Special Verdict

A.    Standard of Review

"On appeal, a district court's interpretation of a verdict rendered pursuant to Fed. R. Civ. P. 49 is reviewed for an abuse of discretion." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618 (6th Cir. 2007); *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x. 730, 2002 WL 1065948, at *6 (6th Cir. 2002) (unpublished) ("We should be deferential to the determination of inconsistency made by a district judge who has observed the jury during the trial, prepared the questions and explained them

to the jury because he is in the best position to determine whether the answers reflect confusion or uncertainty.") (citations and quotations omitted).

B.      Law on Special Verdicts

Federal Rule of Civil Procedure 49(a) governs the procedure of special verdicts. *See Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1519-21 (6th Cir. 1990). When faced with inconsistency within special verdicts, the district court is obliged to try to harmonize the answers. *See*, *e.g.*, *Gallick v. Baltimore & O.R. Co.*, 372 U.S. 108, 119 (1963) ("[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them . . . We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, before we are free to disregard the jury's special verdict and remand the case for a new trial."); *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). As this court has stated, "we look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case" and "make this consistency determination by referring to the jury charge and the total context of the special verdict." *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1148 (6th Cir. 1996); *cf.* 9B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 2510 ("it is the duty of the district court to attempt to harmonize the jury's answers, if it is at all possible under a fair reading of the responses.").

C.      Analysis

The four special verdict questions and jury answers pertaining to sex discrimination were:

1. Did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that her sex was a determining factor in Defendant UPS's decision not to allow her to return to work between November 2002 and November 2004?

(No)

2. Did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that she was treated differently than similarly-situated male employees because of her sex with regard to participation in the TAW program?
(Yes)

3. Did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that Defendant UPS's explanation for its decision not to allow Plaintiff to return to work between November 2002 and November 2004 was a pretext for sex discrimination?

(No)

4. Did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that UPS intentionally denied Plaintiff the opportunity to return to work between November 2002 and November 2004 because of her sex?

(No)

(R. 99 at 1-2.)  The special verdict question and answer regarding damages read,

7. What amount of damages, if any, did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that she is entitled to recover?

(a)  Backpay:  $ 140,504.40

(b)  Other:  $ 60,000

(R. 99 at 3.)

The district court initially entered judgment in favor of UPS on the sex discrimination claims. The court concluded that the one question to which the jury answered "yes" "relates to a prong of Plaintiff's *prima facie* case and does not equate to a determinative finding of intentional discrimination." (R. 99 at 5.)  The court rejected Watts' argument that the question's phrasing –

21

"that she was treated differently than similarly-situated male employees *because of her sex*" (emphasis added) – prompted the ultimate issue in the case, and that by answering that question in the affirmative, the jury found UPS had committed sex discrimination. *Id*. at 6. The court also rejected Watts' argument for harmonizing the "yes" answer on special verdict 2 with the negative answer on 1, 3, and 4 – that special verdict 2 was the only question regarding "the TAW program," whereas the others asked about "returning to work." *Id*. at 6 n.1. The court labeled the jury's yes vote on question 2 as an "apparent finding of disparate treatment," and concluded that that alone did not overcome the jury's "overall finding of no intentional discrimination." *Id*. at 7. The court concluded that in light of its legal analysis no damage award would be warranted for sex discrimination. But because the damages amounts submitted by the jury may have been related to Watts' retaliation claim (for which a new trial would be held), a new trial was necessary on damages. *Id*. at 8.[15]

The court reconsidered its ruling upon Watts' motion for a new trial. (App. 629, 631; R. 126 at 1.) Watts argued, *inter alia*, that only the "treated differently than similarly-situated male employees" language in question 2 was consistent with the question being directed only to establishing one element of a prima facie case of sex discrimination, and that the additional "because of her sex" language was not a part of the prima facie framework of Title VII. (R. 111 at 7.) Watts

---

[15]Judging by its placement on the form, the damages question pertains to both sex discrimination and retaliation. (R. 99 at 1-3.) The jury's findings with regard to retaliation were similarly contradictory – the court submitted two repetitive questions to the jury and received conflicting answers. (R. 99 at 2, 7-8.) Accordingly, it is not at all clear whether the damages amount is associated with a finding of sex discrimination, or a finding of retaliation, or both. On appeal, Watts does not challenge the district court's decision to order a new trial on her retaliation claim.

argued that the additional language could only have been understood by the jury as asking the "ultimate question" (R. 111 at 7-8.) The court concluded that its earlier decision was incorrect, and that the verdicts were irreconcilable. (App. 631.)

The district court did not abuse its discretion in ultimately concluding that the jury's special verdict answers could not be harmonized. By answering "no" to questions 1, 3, and 4, the jury concluded that UPS did not discriminate against Watts because of her sex with regard to returning her to work between November 2002 and November 2004. And the jury's "yes" answer to question 2 can only be understood to squarely conflict with that conclusion.

        1.      The Special Verdict Questions

It is not surprising that the special verdict questions resulted in consistency problems, given their unclear and overlapping nature.[16] Because a court, in evaluating consistency, must construe the jury's answers "in the context of the surrounding circumstances of the case and in connection with

---

[16] Apart from question 3, which clearly inquires about pretext, the remaining questions appear to pose – in three different ways – the ultimate question whether Watts was discriminated against because of her gender. Although there is some indication in the record of the origins of the language of the four questions, the record is not at all clear why the district court selected these four questions as representative of the legal points concerning the sex discrimination claim in this case. In the attorneys' conference with the judge concerning the jury charge and special verdicts, *see* R. 92, it appears that the parties are objecting to a draft jury charge and special verdict document drafted by the court. Though the court's draft is not in the record, it was clearly based at least in part on the parties' earlier proposals, *see* R. 57-1 at 2; R. 58 at 38, 34 (revealing that special verdict question 1 came from Watts' proposed questions, and special verdict question 2 came from UPS's proposed questions). The transcript of the conference does not reveal why the court included four separate questions, or how numbers 1, 2, and 4 differ from each other. *See* R. 92 at 79-86. Nor do the parties' objections and exchanges with the court reveal which legal elements the questions are intended to reflect. *Id.*

the pleadings, instructions, and issues submitted,"[17] this court must first consider whether the information that the jury received from the court or the parties clarified the questions in any way or otherwise modified the jury's understanding of the text.

At closing argument, the parties did not explain the legal role of the set of questions, or indicate how one was different from, or preliminary to, any other. For the most part, UPS's attorney simply read the special verdict question, and instructed the jury which answer would favor UPS's case. *See* R. 94 at 79 (UPS Attorney: "Question 2: Did Plaintiff Teresa Watts prove by a preponderance of the legal evidence that she was treated differently than similarly-situated male employees because of her sex with regard to participation in the TAW program? As we've already discussed, the answer to that question is no."). While Watts' attorney did define terms like "determining factor" and "pretext," counsel did not explain the questions in relation to each other. (R. 94 at 32-35.) Nor did the jury charge on sex discrimination shed light on the rationale behind the special verdict questions.[18] The charge incorporates the language of questions 1 and 2 and gives

---

[17] 9B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2510. *See also Johnson v. Howard*, 24 F. App'x. 480, 485 (6th Cir. 2001) (unpublished per curiam opinion) (quoting *Waggoner v. Mosti*, 792 F.2d 595, 597 (6th Cir. 1986)) ("the consistency of the jury verdicts must be considered in light of the judge's instructions to the jury").

[18] The sex discrimination charge reads in full:

Under federal and state law, it is unlawful for an employer to intentionally discriminate against any person with respect to compensation, tenure, or conditions or privileges of employment because of such person's sex.

In order for Teresa Watts to establish a claim of sex discrimination against UPS, she has the burden of proving by a preponderance of the legal evidence that her sex was a determining factor in UPS's decision not to allow her to return to work between November 2002 and November 2004. To prove her sex discrimination

a definition for "similarly situated." (R. 80 at 19.) It does happen to separate the "similarly situated" and "because of her sex" language of question 2 into two separate sentences, although it is not clear what effect that might have had, if any, on a juror later seeing the two concepts together in the same question. Accordingly, we cannot conclude that the comments of the court and the parties added to the jury's perception of the special verdict questions.

### 2. Watts Not Entitled to Verdict

On appeal, Watts again argues that the verdict can be harmonized in her favor by viewing the special verdict answers as addressing "two distinct employment decisions," one of which would be the basis for judgment in her favor. Watts points out the fact that special verdict 2 was the only question asking the jury to consider her not being allowed to *participate in the TAW program*; the others ask about UPS not allowing her to *return to work*. Watts' argument implicitly acknowledges that the jury's decisions in special verdicts 1, 3, and 4 are not consistent with special verdict 2, but contends that the 1, 3, and 4 "no" answers do not taint the "yes" on question 2, because they do not necessarily conflict with it.

---

claim, Teresa Watts must prove by a preponderance of the legal evidence that UPS intentionally discriminated against her because of her sex. In deciding this issue, you must decide whether she was treated differently than males who were similarly situated.

To be deemed similarly situated, the other individuals to whom Teresa Watts seeks to compare herself must have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. "Similarly situated" means that the comparable employees are nearly identical in all relevant respects.

R. 80 at 19.

Although the language difference Watts raises is conspicuous, we reject this argument. The record supports the understanding that UPS not allowing Watts to participate in TAW and UPS not allowing Watts to return to work were presented to the jury as one and the same. The jury charge language does not support the understanding that there are two separate potentially discriminatory employment decisions in the case. The "Statement of the Case" section comes the closest to separating out two employment actions. *See* Jury Charge, R. 80 at 17 ("The Plaintiff claims that UPS denied her request to be assigned . . . TAW, *and* to return to work between November 2002 and December 2004.") (emphasis added). However, elsewhere, the jury charge uses only "return to work" (and does not mention TAW) or references only TAW participation (and not "return to work") in a context in which it would not make sense for the court to be charging the jury as to only one of two employment actions. *See id.* at 16 (the entire instruction on "Isolated, Stray Remarks" reads "You are instructed that any comments regarding Plaintiff's *participation in the TAW program* that were not made by a decision maker should not be considered as legal evidence of discrimination or retaliation.") (emphasis added); *id.* at 17 ("UPS denies that it unlawfully discriminated against Teresa Watts. UPS states that it denied the Plaintiff's *request for TAW* because . . .") (emphasis added); *id.* at 19 (only relevant reference in entire section on "Sex Discrimination" is "In order for Teresa Watts to establish a claim of sex discrimination . . . she has the burden of proving . . . that her sex was a determining factor in UPS's decision *not to allow her to return to work* between November 2002 and November 2004.") (emphasis added); *id.* at 20 (entire "Determining Factor" section citing only UPS decision not allowing Watts to "*return to work*") (emphasis added). Further, the court and the parties used the descriptions interchangeably at trial, and Watts did not argue that

26

she was attempting to "return to work" in any way other than participating in the TAW program.

Accordingly, there is real conflict in the jury's verdict; we can identify no view of the case that makes the jury's answers consistent. Unless there is a legitimate reason that one of the special verdict answers should trump another, the district court was correct to order a new trial.

### 3. General Verdict Considerations

Watts also argues that the jury's special verdict answer awarding her both back pay and "other" damages outweighs the portion of the jury's negative answers on some sex-discrimination questions. Watts emphasizes that, in considering the damages question, the jury was instructed "not to award any damages unless [Watts] has established by a preponderance of the legal evidence that the damage was caused by UPS's actions," and to award back pay "for any period during which she was not allowed to return to work due to unlawful discrimination." *See* Jury Charge, R. 80 at 24, 25. Regarding "other" damages, the court instructed the jury, "[t]o recover these damages, [Watts] must prove by a preponderance of the legal evidence that she suffered the particular injury and that the injury was a direct result of UPS's unlawful discrimination or retaliation." *Id*. at 27. Watts' argument appears to be that the jury's answer to the damages question is a *general* verdict, rather than a *special* verdict – that the jury's award of damages reflects its ultimate judgment on the legal merit of the discrimination claim as a whole. *See Mason v. Fort Motor Co., Inc*., 307 F.3d 1271, 1274 (11th Cir. 2002) (general verdict is "verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions"); *cf. id*. ("In contrast . . . [w]ith a special verdict, the jury's sole function is to determine the facts; the jury needs no instruction on the law because the court applies the law to the facts as found by the jury.").

27

Even accepting Watts' argument that the damages verdict reflects a general verdict, the presence of the negative answers on questions 1, 3, and 4 cannot be discounted. Federal Rule of Civil Procedure 49(b) governs general verdicts and the written questions that accompany them. "When the answers [to the questions accompanying the general verdict] are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered." Fed. R. Civ. P. 49(b)(4). Instead, the court "must direct the jury to further consider its answers and verdict, or must order a new trial." *Id. Accord* 9B CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2513. Accordingly, judgment for Watts would have been improper.[19]

For these reasons, the district court acted properly when it ultimately granted a new trial on the jury's special verdict concerning sex discrimination, and denied Watts' motion for judgment on the special verdicts.

## CONCLUSION

Accordingly, we **AFFIRM** in part and **REMAND** for new trial on Watts' disability discrimination claim.

---

[19]Incidentally, Watts' arguments fare no better in the special verdict context. The presence of a jury damage award does not dictate this court's legal evaluation whether one portion of the jury's special verdict was inconsistent with other portions of its special verdict. *Compare Freeman v. Chicago Park Dist.*, 189 F.3d 613, 615-16 (7th Cir. 1999) (in special verdict context, new trial not necessary where jury found plaintiff was harassed and suffered $45,000 in damages, but judgment entered for the defendant, because the jury had also concluded that the harassment was not motivated by racial prejudice, and therefore, the plaintiff did not establish a Title VII violation). As the proper remedy for inconsistent verdicts is a new trial, *see id.* at 615, the district court did not err.